**T. J. STARKER, Appellant,**

v.

**UNITED STATES of America, Appellee.**

No. 77–2826.

United States Court of Appeals, Ninth Circuit.

Aug. 24, 1979.

Charles P. Duffy, Duffy, Georgeson, Kelel & Benner, Portland, Ore., on brief for appellant.

Francis J. Gould, Atty., Dept. of Justice, Washington, D. C., for appellee; M. Carr Ferguson, Asst. Atty. Gen., Washington, D. C., on brief.

Before GOODWIN and ANDERSON, Circuit Judges, and JAMESON *, District Judge.

GOODWIN, Circuit Judge:

T. J. Starker appeals from the dismissal, on stipulated facts, of his tax refund action. We affirm in part and reverse in part.

## I. FACTS

On April 1, 1967, T. J. Starker and his son and daughter-in-law, Bruce and Elizabeth Starker, entered into a "land exchange agreement" with Crown Zellerbach Corporation (Crown). The agreement provided that the three Starkers would convey to Crown all their interests in 1,843 acres of timberland in Columbia County, Oregon.

---

* The Honorable William J. Jameson, United States District Judge for the District of Montana, sitting by designation.

In consideration for this transfer, Crown agreed to acquire and deed over to the Starkers other real property in Washington and Oregon. Crown agreed to provide the Starkers suitable real property within five years or pay any outstanding balance in cash. As part of the contract, Crown agreed to add to the Starkers' credit each year a "growth factor", equal to six per cent of the outstanding balance.

On May 31, 1967, the Starkers deeded their timberland to Crown. Crown entered "exchange value credits" in its books: for T. J. Starker's interest, a credit of $1,502,-500; and for Bruce and Elizabeth's interest, a credit of $73,000.

Within four months, Bruce and Elizabeth found three suitable parcels, and Crown purchased and conveyed them pursuant to the contract. No "growth factor" was added because a year had not expired, and no cash was transferred to Bruce and Elizabeth because the agreed value of the property they received was $73,000, the same as their credit.

Closing the transaction with T. J. Starker, whose credit balance was larger, took longer. Beginning in July 1967 and continuing through May 1969, Crown purchased 12 parcels selected by T. J. Starker. Of these 12, Crown purchased 9 from third parties, and then conveyed them to T. J. Starker. Two more of the 12 (the Timian and Bi-Mart properties) were transferred to Crown by third parties, and then conveyed by Crown at T. J. Starker's direction to his daughter, Jean Roth. The twelfth parcel (the Booth property) involved a third party's contract to purchase. Crown purchased that contract right and reassigned it to T. J. Starker.

The first of the transfers from Crown to T. J. Starker or his daughter was on September 5, 1967; the twelfth and last was on May 21, 1969. By 1969, T. J. Starker's credit balance had increased from $1,502,-500 to $1,577,387.91, by means of the 6 per cent "growth factor". The land transferred by Crown to T. J. Starker and Roth was valued by the parties at exactly $1,577,-387.91. Therefore, no cash was paid to T. J.

Starker, and his balance was reduced to zero.

In their income tax returns for 1967, the three Starkers all reported no gain on the transactions, although their bases in the properties they relinquished were smaller than the market value of the properties they received. They claimed that the transactions were entitled to nonrecognition treatment under section 1031 of the Internal Revenue Code (I.R.C. § 1031), which provides in part:

"(a) Nonrecognition of gain or loss from exchanges solely in kind.

No gain or loss shall be recognized if property held for productive use in trade or business or for investment (not including stock in trade or other property held primarily for sale, nor stocks, bonds, notes, choses in action, certificates of trust or beneficial interest, or other securities or evidences of indebtedness or interest) is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment."

The Internal Revenue Service disagreed, and assessed deficiencies of $35,248.41 against Bruce and Elizabeth Starker and $300,930.31 plus interest against T. J. Starker. The Starkers paid the deficiencies, filed claims for refunds, and when those claims were denied, filed two actions for refunds in the United States District Court in Oregon.

In the first of the two cases, *Bruce Starker v. United States (Starker I),* 75–1 U.S. Tax Cas. (CCH) ¶ 8443 (D.Or.1975), the trial court held that this court's decision in *Alderson v. Commissioner,* 317 F.2d 790 (9th Cir. 1963), compelled a decision for the taxpayers. Bruce and Elizabeth Starker recovered the claimed refund. The government appealed, but voluntarily dismissed the appeal, and the judgment for Bruce and Elizabeth Starker became final.

The government, however, did not capitulate in *T. J. Starker v. United States (Starker II),* the present case. The government continued to assert that T. J. Starker

was not entitled to section 1031 nonrecognition. According to the government, T. J. Starker was liable not only for a tax on his capital gain, but also for a tax on the 6 per cent "growth factor" as ordinary income (interest or its equivalent).

The same trial judge who heard *Starker I* also heard *Starker II*. Recognizing that "many of the transfers here are identical to those in *Starker I*", the court rejected T. J. Starker's collateral-estoppel argument and found for the government. The judge said:

"I have reconsidered my opinion in *Starker I*. I now conclude that I was mistaken in my holding as well in my earlier reading of *Alderson*. Even if *Alderson* can be interpreted as contended by plaintiff, I think that to do so would be improper. It would merely sanction a tax avoidance scheme and not carry out the purposes of § 1031." *T. J. Starker v. United States*, 432 F.Supp. 864, 868, 77–2 U.S. Tax Cas. (CCH) ¶ 9512 (D.Or.1977). Judgment was entered for the government on both the nonrecognition and ordinary income (interest) issues, and this appeal followed.

T. J. Starker asserts that the district court erred in holding that: (a) his real estate transactions did not qualify for nonrecognition under I.R.C. § 1031; (b) the government was not collaterally estopped from litigating that issue; and (c) the transactions caused him to have ordinary income for interest, in addition to a capital gain.

## II. COLLATERAL ESTOPPEL

T. J. Starker argues that the decision in *Bruce Starker v. United States* collaterally estops the government from litigating the application of section 1031 to his transactions with Crown. The government urges this court to affirm the trial court on this point, claiming that the two cases presented different legal questions, facts and parties.

*A. Legal question presented.*

■ In order for collateral estoppel to apply, the issue to be foreclosed in the second litigation must have been litigated and decided in the first case. The government argues that the legal question presented in *T. J. Starker* is different than that in *Bruce Starker.* According to the government, *Bruce Starker* merely decided that the term "exchange" in section 1031 does not require a simultaneous exchange of title or beneficial ownership. By contrast, it argues, *T. J. Starker* presents the question whether the lack of a simultaneous exchange and the possibility of the taxpayer's receiving cash render the consideration given the taxpayer something other than "property of a like kind".

The first problem, then, is that of defining the legal "issue" for purposes of collateral estoppel. Stated broadly, the legal "issue" decided in *Bruce Starker* was whether section 1031 applied to the transfers pursuant to the Starker-Crown contract. Defined narrowly, the issue was, as the government argues, whether the term "exchange" contains a notion of simultaneity.

While there is a sizeable body of authority on the other aspects of the government's collateral estoppel arguments, there is little clear precedent on the scope of a legal "issue". However, the emerging Restatement (Second) of Judgments, now in draft, marks the way through this murky area. Section 68 of Tentative Draft No. 4 (1977) states four factors to be considered by the court in deciding what the issue decided in the prior action was:

(1) Was there a substantial overlap between the evidence or argument advanced in the second proceeding and that advanced in the first?

(2) Does the new evidence or argument involve the application of the same rule of law as that involved in the prior proceeding?

(3) Could pretrial preparation and discovery in the first proceeding reasonably be expected to have embraced the matter to be presented in the second?

(4) How closely related are the claims?

As T. J. Starker pointed out below, the government's evidence and argument in his

case are quite similar to those presented in *Bruce Starker v. United States (Starker I)*. There, the government argued, just as it does here, that in 1967, the Starkers received mere promises, not real property, in consideration for their timberland. From that point, the government went on to argue in *Starker I* that there was no "exchange" because the reciprocal transfers of land came later. Hence, it concluded, section 1031 did not apply. Here, the government's first point and conclusion remain exactly the same: T. J. Starker received a mere promise, and section 1031 does not apply. Only the connecting argument between these two assertions differs in the two cases. Here, instead of declaring that no "exchange" took place because the transfers were not simultaneous, the government asserts that if there was an "exchange", it was not of "property of a like kind" because the transfers were not simultaneous.

Despite a switch in the verbal formula, the government's argument here is substantially identical to that in *Bruce Starker v. United States*. The government's appeals to the purposes and legislative history of I.R.C. § 1031 are the same. And even if its argument here can be said to differ from that in the first case, under the draft Restatement approach, *supra,* the pretrial preparation of *Bruce Starker* could reasonably be expected to have alerted the government to both verbal formulations of its argument.

If the government were arguing from the language of the statute, *i. e.,* on the plain meaning of "exchange" or "like kind", then the difference in the statutory language it chooses to emphasize would be relevant. But it has chosen to rely on other arguments—precedent and legislative history—in both *T. J. Starker* and *Bruce Starker*. In both cases, the government relies on the same sentence, the same subsection of the Code, for the same result. Hence, the government's attempts to sever the legal questions in *Starker I* and *Starker II* are unconvincing. We reject them.

*B. Facts.*

The second prong of the government's argument in support of the district court's ruling on collateral estoppel is that the facts in *Bruce Starker v. United States* are sufficiently separable from those in the instant case to make the estoppel doctrine inapplicable. A prominent case on the identity of facts required for collateral estoppel is *Commissioner v. Sunnen,* 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898 (1948). At the time this case was argued, both parties admitted *Sunnen* controlled.

In *Sunnen,* an inventor licensed his invention, and assigned the license contracts and royalties thereunder to his wife. The question presented to the court was whether the inventor was liable for taxes on the income paid to his wife by the licensee under this arrangement in the years 1937 to 1941. In previous litigation, the Board of Tax Appeals (now the Tax Court) had held that for the years 1929 to 1931, the taxpayer was not liable for payments made to his wife under a set of licenses entered into in 1928. In the second case, both the 1928 contracts and other contracts were involved.

The Supreme Court began by noting that res judicata was inapplicable. That doctrine, it said, required that both suits involve the same cause of action, and suits over tax liabilities in two different years were two separate causes of action. 333 U.S. at 597–98, 68 S.Ct. 715.

The Court went on to hold that, except for payments made under the 1928 contracts, collateral estoppel could not apply, either. Relying on what it termed the traditionally accepted concepts of collateral estoppel, it declared that even though the license contracts may have been substantively identical, the fact that they were separate documents made each contract a part of a different issue for collateral estoppel purposes:

" * * * [I]f the relevant facts in the two cases are separable, even though they be similar or identical, collateral estoppel does not govern the legal issues which recur in the second case. Thus the second proceeding may involve an instrument or

transaction identical with, but in a form separable from, the one dealt with in the first proceeding. In that situation, a court is free in the second proceeding to make an independent examination of the legal matters at issue. * * * Before a party can invoke the collateral estoppel doctrine in these circumstances, the legal matter raised in the second proceeding must involve the same set of events or documents and the same bundle of legal principles that contributed to the rendering of the first judgment." 333 U.S. at 601–02, 68 S.Ct. at 721 (footnote omitted). The Court thus concluded that collateral estoppel could not apply to any of the payments before it except those made pursuant to the 1928 contracts. Moreover, it held that although collateral estoppel ordinarily would bar relitigation of the payments under the 1928 contracts, the law regarding the taxability of assigned income payments had so changed since the Board of Tax Appeals' decision that the case fit into an exception to the collateral estoppel doctrine. 333 U.S. at 602–07, 68 S.Ct. 715.[1]

The Supreme Court's recent decision in *Montana v. United States,* 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979), calls *Sunnen* into question. Although *Montana* did not expressly overrule *Sunnen,* the Court ignored *Sunnen* 's rigid "separable facts" test. It held collateral estoppel applicable even though some facts differed in the two cases at issue, because the differing facts were not "essential to the judgment" or "of controlling significance" in the first case. 440 U.S. at 158, 99 S.Ct. 976. In *Montana,* the Court held that the United States' federal court challenge to a state tax on public contractors was precluded by a prior state court challenge to the same tax. The first suit was brought by a contractor, but the United States, to whom the tax had been passed on, financed and controlled the first suit. When the State of Montana won the first case, the United States decided, as it did in *Starker I,* not to pursue an available appeal. The Court found that the United States' control of the first action put it in the same position it would have occupied had it instituted both actions in its own name.

Although the United States claimed in *Montana* that "the contract at issue in [the first case] contained a critical provision which the contracts in the [second] litigation [did] not," 440 U.S. at 158, 99 S.Ct. at 976, the Court said that collateral estoppel

1. *See generally* Goldstein, *Res Judicata and Collateral Estoppel,* 54 A.B.A.J. 1131 (1968).

*Sunnen* became something of an enigma. Courts and commentators seemed to assume that it provided for a special, narrow application of collateral estoppel unique to tax law, but at least one writer criticized this view. *See* Heckman, *Collateral Estoppel As the Answer to Multiple Litigation Problems in Federal Tax Law,* 19 Case W.Res.L.Rev. 230 (1968). The "mechanical application" of the "separable facts" doctrine also drew fire from the reporter to the draft Restatement (Second) of Judgments. *See* notes following § 68, Tentative Draft No. 4 (1977). In any event, this court has followed *Sunnen* to limit collateral estoppel. In *Commissioner v. John Danz Charitable Trust,* 284 F.2d 726 (9th Cir. 1960), we held that a decision that a trust was not *operated* solely for charitable purposes did not estop the taxpayer from arguing in a case on a later taxable year that the trust was *organized* solely for such purposes. The legal issues in the two cases were obviously distinguishable. Totally different aspects of the trust's history were argued about, and radically different evidence presented.

In *Walt Disney Productions v. United States,* 549 F.2d 576 (9th Cir. 1976), the issue was the availability of the investment tax credit. The Commissioner had already lost a case in which he argued that a set of master negatives produced by the taxpayer did not qualify for the credit. In a second case, he was making an identical argument about similar negatives for different "properties". The court held that since different taxable years and different master negatives were involved, neither res judicata nor collateral estoppel applied.

The facts of *Sunnen* were distinguished in *Southwest Exploration Co. v. Riddell,* 362 F.2d 833 (9th Cir. 1966). In that case, the court held that collateral estoppel would have blocked any relitigation by the taxpayer-lessee of the deductibility of depletion on leased land. The crucial fact was that the legal relationship between the taxpayer and its lessors remained unchanged between the first suit and 1956. Thus, interest on the taxpayer's deficiency was held to accrue as of that year, even though formal assessment of the deficiency did not take place until 1957.

precluded the second, federal court, action. In the contracts at issue in the first case, contractors promised the United States that they would not take advantage of credits offered by the State as part of its tax package; in the contracts at issue in the second, the contractors could take the State credits. The United States argued that in the first action, the state court had assumed that the credits, available but for the voluntary contract provision, could have entirely offset the tax. Under the later contracts, however, even where the credits could be taken, it turned out that a complete "washout" was impossible. Therefore, citing *Commissioner v. Sunnen, supra*, the United States argued that its case should not have been dismissed. The Supreme Court rejected this argument. It noted that the state court had declared that its decision did not turn on the potential for a "washout"; the state court regarded that fact as "inconsequential". 440 U.S. at 158, 99 S.Ct. 976. *Sunnen* was limited by the Court to cases in which there had been a significant "change in the legal climate", such as that worked by two Supreme Court decisions [2] that intervened between *Sunnen I* and *Sunnen II*. 440 U.S. at 158, 99 S.Ct. 970, *quoting Commissioner v. Sunnen*, 333 U.S. at 606, 68 S.Ct. 715.

There was no change in the tax treatment of like-kind exchanges between *Starker I* and *Starker II*. Indeed, between the government's abandonment of *Starker I* and the decision in *Starker II*, there was little or no litigation on the question whether simultaneity of title transfer is required for nonrecognition treatment. The only change was in the trial judge's understanding of section 1031.[3] Therefore, *Sunnen*, as limited by *Montana*, is inapplicable to this appeal, and we must analyze the similarity of the facts of *Starker I* and *Starker II* under the later case.[4] Although *Montana* was not the law when this case was first briefed and argued, we have requested and received supplemental briefs. We apply the law as it exists at the time we decide the appeal before us. *See Cort v. Ash*, 422 U.S. 66, 76–77, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975); *United States v. Fresno Unified School District*, 592 F.2d 1088, 1093 (9th Cir. 1979) (citing cases).

The trial court's opinion in *Starker I* dealt with Bruce and Elizabeth Starker's reciprocal, but not simultaneous, transfers of title to Crown and another corporation. The *Starker I* court noted that at the time the Starkers transferred their land to Crown, Crown did not own the land ultimately transferred to them. If "a taxpayer

**2.** *Helvering v. Horst*, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75 (1940), and *Helvering v. Clifford*, 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788 (1940).

**3.** The correctness of the ruling in *Starker I* is irrelevant for collateral estoppel purposes. "[A] judgment, not set aside on appeal or otherwise, is equally effective as an estoppel upon the points decided, whether the decision be right or wrong." *Hatchitt v. United States*, 158 F.2d 754, 756 (9th Cir. 1946), *quoting Reed v. Allen*, 286 U.S. 191, 201, 52 S.Ct. 532, 76 L.Ed. 1054 (1932).

**4.** Although we no longer follow it on the question of similarity of facts, *Sunnen* may have led us to reach the same result as we reach under *Montana*. The facts of the two Starker cases could easily be assessed in light of *Sunnen* as follows: Unlike those in *Sunnen*, the contracts in the two Starker cases are embodied in the same document. Moreover, all the transfers of land by the Starkers to Crown were made with the same deed. It is true that Crown conveyed different parcels to Bruce and Elizabeth Sarker than it did to T. J. Starker, but this would not compel a finding of "separability" under *Sunnen*. In *Sunnen*, the royalty payments at issue in the two suits were made in different transactions; they were made in different years. The taxpayer therefore obviously received different sums, with different instruments or amounts of cash being given from the licensee to the taxpayer. Nonetheless, as to the payments made pursuant to the same 1928 contracts, the Supreme Court indicated that collateral estoppel would have applied had the relevant tax law not changed between the two decisions. *Commissioner v. Sunnen*, 333 U.S. at 602, 68 S.Ct. 715. Here, the exchange agreement can be likened to the 1928 contracts, the Starkers' Columbia County timberland to the rights in Sunnen's invention, and the different parcels transferred to Crown to the different payments by the licensee.

Thus, under *Sunnen*, just as under *Montana*, the only relevant differences between *Starker I* and *Starker II* may have been with regard to the Bi-Mart, Timian, and Booth properties.

disposes of all his rights in property for a promise from the transferee to convey like-kind property in the future", the court said, that transaction is still an exchange "solely for properties of a like kind". 75–1 U.S.Tax Cas. (CCH) at p. 87,143. The opinion said nothing to indicate that the court considered significant the amount of time elapsed between the taxpayers' transfer of title and their receipt of title. Under a fair reading of *Starker I*, the length of the time lapse is inconsequential. Thus, *Starker II* cannot be distinguished on that ground. Indeed, in its opinion in *Starker II*, the court did not distinguish the facts of *Starker I*; it straightforwardly overruled it, recognizing "that many of the transfers here are identical to those in *Starker I.*" *T. J. Starker v. United States*, 432 F.Supp. at 867. Hence, as to the nine properties to which T. J. Starker himself actually received title directly from Crown, collateral estoppel is warranted under *Montana v. United States, supra.*

On the other hand, as to the three other properties received by T. J. Starker under the contract, collateral estoppel should not apply under *Montana.* These are the Bi-Mart, Timian, and Booth properties. Title to the Bi-Mart and Timian properties was transferred by Crown, not to T. J. Starker, but to his daughter, Jean Roth. Crown never acquired title to the Booth property; instead, it acquired a right to purchase, which it transferred to T. J. Starker. Not having such transfers before it in *Starker I*, the district court could not have considered the effects of such circuitous transfers on the nonrecognition issue. Indeed, the court gave the transfer to Roth as an example of "issues" in *Starker II* "which were not raised in *Starker I.*" 432 F.Supp. at 867. And, unlike the state court in *Montana*, the district court gave no hint that it thought such differences in facts would be inconsequential.

In sum, collateral estoppel is inapplicable to T. J. Starker's receipt of the Bi-Mart, Timian, and Booth properties under *Montana.* But if the other requirements of collateral estoppel are met, collateral estoppel is applicable to the other nine parcels he received.

### C. Parties.

T. J. Starker was not a party to *Bruce Starker v. United States.* There is no evidence on the record that he was in privity with the parties to that suit, or that he controlled or financed it. *Compare Montana v. United States, supra.* Hence, had his son lost in the first litigation, T. J. Starker could not have been bound by that judgment. In his own case, however, he seeks to assert his son's victory "offensively" to estop the government defendant.

In *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (U.S.1979), the Supreme Court made it clear that a defendant who has a full and fair opportunity to litigate an issue in one action may be precluded from defending itself on the same issue in another action brought by a different party. This approval of some "offensive" use of collateral estoppel followed a trend, established in a long line of cases, discarding the old notion that one who could not be bound by an adverse judgment in a prior lawsuit could not assert a favorable judgment from that suit in a later action. *E.g., Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971); *Green v. Ancora-Citronelle Corp.,* 577 F.2d 1380 (9th Cir. 1978); *United Air Lines, Inc. v. Wiener,* 355 F.2d 379, 404–05 (9th Cir. 1964), aff'g *United States v. United Air Lines, Inc.,* 216 F.Supp. 709, 725–29 (D.Nev.1962); *Bernhard v. Bank of America National Trust and Savings Association,* 19 Cal.2d 807, 122 P.2d 892 (1942).[5]

---

**5.** Despite this trend away from mutuality, the government has argued that it should be revived for federal tax cases. It has so persuaded the Second Circuit. In *Divine v. Commissioner,* 500 F.2d 1041 (2d Cir. 1974), that court read its earlier decisions narrowly, and

carved out an exception to the *Blonder-Tongue* and *Bernhard* rules for tax cases. The court cited three general considerations behind its decision: the far-reaching effects of tax litigation, the novelty and obscurity of parts of the Internal Revenue Code (which made judicial

In *Parklane Hosiery*, the Court laid out a new analysis for cases presenting offensive collateral estoppel. It said that trial courts should have discretion to decide when collateral estoppel should be applied offensively, but that such discretion was bounded by a number of important considerations.

"The general rule should be that in cases where a plaintiff could easily have joined in the earlier action * * * a trial judge should not allow the use of offensive collateral estoppel." 439 U.S. at 331, 99 S.Ct. at 651, 652. The doctrine should also be avoided, the Court said, where its application would be unfair to the defendant in the second suit. Such unfairness could arise if the defendant had an insufficient incentive to litigate the first action; the judgment in the first action was inconsistent with a previous decision in the defendant's favor; or there are procedural opportunities available to the defendant in the second action that were not available in the first. *Id.* If the plaintiff could not "easily have joined in the first action", if there is no unfairness to the defendant, and if the defendant had a full and fair opportunity to litigate the issue in the first suit, then collateral estoppel should apply. *Id.*

The district court did not have the benefit of *Parklane Hosiery v. Shore* when it decided T. J. Starker's claims. Since the case was submitted on stipulated facts, however, we discern no useful purpose in a remand for the exercise of the discretion called for in *Parklane Hosiery*. This court can apply to agreed facts the discretionary standards set out in that opinion.

The fairness aspects of *Parklane Hosiery* do not preclude our applying collateral estoppel here. The government had plenty of incentive to litigate *Starker I*, in which a $37,342 refund was at stake. The judgment in *Starker I* was not inconsistent with any known prior authority; indeed, the government's decision not to appeal the case implies as much. There were no procedural opportunities in *Starker II* that were not available in *Starker I*; the two cases were brought in the same court before the same judge. Finally, the government does not argue that the first trial did not afford it a full and fair opportunity to present its theory of the case.

The Court's "general rule", that a plaintiff who could "easily have joined" a first suit cannot assert collateral estoppel in a second, raises more troublesome questions. It is unclear from *Parklane Hosiery* what type of "ease" is relevant. In the present case, Fed.R.Civ.P. 20 may have technically authorized T. J. Starker's joinder in his son and daughter-in-law's refund suit. The father's suit differs from that of his son in so many respects, however, that there are numerous possible explanations why T. J. Starker—or for that matter, Bruce and Elizabeth Starker—might have wanted the lawsuits tried separately.[6] We decline to speculate on motivation. This is not a case in which a litigant adopted a "wait-and-see" attitude for the obvious purpose of eluding

conflicts likely), and the Supreme Court's practice of taking tax cases only when circuit courts conflict.

To the extent that it survives *Parklane Hosiery Co. v. Shore, supra,* we think *Divine* has no applicability to cases arising within the same circuit. Moreover, even as to tax cases arising in different circuits—a situation we do not have before us—we question the reasoning in *Divine*. Under *Montana v. United States, supra,* the only parties who can invoke collateral estoppel are those whose transactions are so similar to those of previously victorious taxpayers that there is no question that the result under prior cases would have been identical. Thus, the abandonment of mutuality of estoppel in multiple-circuit situations could cause no undue decrease in the ability of the Internal Revenue Service to enforce the tax laws equita-

bly. It would simply require the Service to accept similar results for similarly situated taxpayers, and heighten the incentive for it to litigate all aspects of tax cases vigorously the first time around.

**6.** As noted in our discussion of the facts of *Starker I* and *Starker II, supra,* the first case involved three direct transfers from Crown and numerous other direct transfers from another corporation to the taxpayers, whereas the second involves nine direct transfers from Crown, three indirect transfers from Crown, and none from any other corporation. The case at bar also presents the question of the proper treatment of the "growth factor" added to T. J. Starker's account; his son and daughter-in-law received no such credit.

the binding force of an initial resolution of a simple issue. Thus, we exercise our discretion in favor of T. J. Starker and hold that the government can be estopped as against him because of the final resolution of Bruce and Elizabeth Starker's suit.

### D. Conclusion on Collateral Estoppel.

■ The government, having lost its case against this taxpayer's son based on the same contract to transfer the same family lands, decided not to pursue an appeal in that case, but instead to pursue this taxpayer. Although T. J. Starker's transactions involving three of the parcels differed in a relevant way from those of his son, the legal issues and facts surrounding the other nine are so similar that collateral estoppel applies. Except as to the Bi-Mart, Timian, and Booth properties, the government should have been held collaterally estopped by *Starker I* from relitigation of the applicability of I.R.C. § 1031 in *Starker II.*

### III. TIMIAN, BI–MART, AND BOOTH PROPERTIES

As to Timian, Bi-Mart, and Booth properties, the facts of *Starker I* are so different from those of this case that the entire issue of the applicability of section 1031 to them was properly before the district court in *Starker II.* The court therefore correctly went to the merits of the litigants' arguments as they pertained to these parcels. We now turn to those arguments.

As with the other nine parcels T. J. Starker received, none of these three properties was deeded to him at or near the time he deeded his timberland to Crown. T. J. Starker admits that he received no interest in these properties until a substantial time after he conveyed away title to his property. Thus, the question whether section 1031 requires simultaneity of deed transfers is presented as to all three. In addition, each of these parcels presents its own peculiar issues because of the differing circumstances surrounding their transfers.

### A. Timian and Bi-Mart Properties.

The Timian property is a residence. Legal title to it was conveyed by Crown at T. J. Starker's request to his daughter, Jean Roth, in 1967. T. J. Starker lives in this residence, and pays rent on it to his daughter. The United States argues that since T. J. Starker never held legal title to this property, he cannot be said to have exchanged his timberland for it. Furthermore, the government contends, because the property became the taxpayer's personal residence, it is neither property "held for investment" nor of a like kind with such property under the meaning of the Code. On the other hand, the taxpayer argues that there was, in economic reality, a transfer of title to him, followed by a gift by him to his daughter.[7]

The Bi-Mart property, a commercial building, was conveyed by Crown to Roth in 1968. The government raises the same issue with regard to the Bi-Mart property: since T. J. Starker never had title, he did not effect an exchange. T. J. Starker points out, however, that he expended substantial time and money in improving and maintaining the structure in the three months prior to the conveyance of the property to his daughter, and he emphasizes that he controlled and commanded its transfer to her.

■ We begin our analysis of the proper treatment of the receipt of these two properties with a consideration of the Timian residence. T. J. Starker asserts that the question whether such property can be held "for investment" is unsettled. We disagree. It has long been the rule that use of property solely as a personal residence is antithetical to its being held for investment. Losses on the sale or exchange of such property cannot be deducted for this reason, despite the general rule that losses from transactions involving trade or investment properties are deductible. Treas.Regs.

---

7. Apparently, T. J. Starker paid a gift tax in 1968 on the transfers of the Bi-Mart and Timian properties to his daughter, but the question whether he truly owed such a tax is not before us.

§ 1.165–9(a); *see Shields v. Commissioner*, 1978–120 T.C.M. (CCH) Dec. 35,064(M). A similar rule must obtain in construing the term "held for investment" in section 1031. 3 J. Mertens, Law of Federal Income Taxation § 20.26 (1972); *see Boesel v. Commissioner*, 65 T.C. 378, 389 (1975); Rev.Rul. 59–229, 1959–2 Cum.Bull. 180. Thus, nonrecognition treatment cannot be given to the receipt of the Timian parcel.

■ Moreover, T. J. Starker cannot be said to have received the Timian or Bi-Mart properties in exchange for his interest in the Columbia County timberland because title to the Timian and Bi-Mart properties was transferred by Crown directly to someone else, his daughter. Under an analogous nonrecognition provision, section 1034 of the Code, the key to receiving nonrecognition treatment is maintaining continuity of title. Under section 1034, if title shifts from the taxpayer to someone other than the taxpayer's spouse, nonrecognition is denied. *Marcello v. Commissioner*, 380 F.2d 499 (5th Cir. 1967); *Boesel v. Commissioner*, *supra*, we find similar reasoning compelling here. Although in some cases a father and his daughter may be seen as having an identity of economic interests (*cf. McWilliams v. Commissioner*, 331 U.S. 694, 699, 67 S.Ct. 1477, 91 L.Ed. 1750 (1947)), that unity is not sufficient to make transfer of title to one the same as transfer of title to the other. T. J. Starker has not shown that he has any legally cognizable interest in the Timian or Bi-Mart properties that would entitle him to prevent Jean Roth from exercising full ownership rights. In case of a disagreement about the use or enjoyment of these properties, her wishes, not his, would prevail. In these circumstances, T. J. Starker cannot be said to have "exchanged" properties under section 1031, because he never received any property ownership himself.[8]

### B. Booth Property.

The Booth property is a commercial parcel, title to which has never been conveyed to T. J. Starker. The transfer of this property to him was achieved in 1968 by Crown's acquiring third parties' contract right to purchase the property, and then reassigning the right to T. J. Starker. In addition to emphasizing the lack of simultaneity in the transfers, the government points here to the total lack of deed transfer.

An examination of the record reveals that legal title had not passed by deed to T. J. Starker by the time of the trial. He continued to hold the third-party purchasers' rights under a 1965 sales agreement on the Booth land. That agreement notes that one of the original transferors holds a life interest in the property, and that legal title shall not pass until that life interest expires. In the meantime, the purchasers are entitled to possession, but they are subject to certain restrictions. For example, they are prohibited from removing improvements and are required to keep buildings and fences in good repair. Under the agreement, a substantial portion of the purchase price must be invested, with a fixed return to be paid to the purchaser of the life interest. Should any of these conditions fail, the agreement provides, the sellers may elect, *inter alia*, to void the contract.

■ Despite these contingencies, we believe that what T. J. Starker received in 1968 was the equivalent of a fee interest for purposes of section 1031. Under Treas. Regs. § 1.1031(a)–1(c), a leasehold interest of 30 years or more is the equivalent of a fee interest for purposes of determining whether the properties exchanged are of a like kind. Under the assigned purchase rights, Starker had at least the rights of a long-term lessee, plus an equitable fee subject to conditions precedent. If the seller's life interest lasted longer than 30 years, the leasehold interest would be the equivalent of a fee; the fact that the leasehold might ripen into a fee at some earlier point should

---

**8.** The taxpayer does not argue that he has a leasehold interest of 30 years or more in the Timian or Bi-Mart properties.

not alter this result. Thus, we hold that what T. J. Starker received in 1968 was the equivalent of a fee.

This does not solve the riddle of the proper treatment of the Booth parcel, however. Since the taxpayer did not receive the fee equivalent at the same time that he gave up his interest in the timberland, the same issue is presented as with the nine parcels on which the government was estopped, namely, whether simultaneity of transfer is required for nonrecognition treatment under section 1031.

The government's argument that simultaneity is required begins with Treas.Reg. § 1.1002–1(b). That regulation provides that all exceptions to the general rule that gains and losses are recognized must be construed narrowly:

> " * * * Nonrecognition is accorded by the Code only if the exchange is one which satisfies both (1) the specific description in the Code of an excepted exchange, and (2) the underlying purpose for which such exchange is excepted from the general rule."

There are two problems, however, with applying this regulation to section 1031.

First, the "underlying purpose" of section 1031 is not entirely clear. The legislative history reveals that the provision was designed to avoid the imposition of a tax on those who do not "cash in" on their investments in trade or business property. Congress appeared to be concerned that taxpayers would not have the cash to pay a tax on the capital gain if the exchange triggered recognition. This does not explain the precise limits of section 1031, however; if those taxpayers sell their property for cash and reinvest that cash in like-kind property, they cannot enjoy the section's benefits, even if the reinvestment takes place just a few days after the sale. Thus, some taxpayers with liquidity problems resulting from a replacement of their business property are not covered by the section. The liquidity rationale must therefore be limited.

Another apparent consideration of the drafters of the section was the difficulty of valuing property exchanged for the purpose of measuring gain or loss. Section 1031(a) permits the taxpayer to transfer the basis of the property he or she gives up to the property he or she receives, thus deferring the valuation problem, as well as the tax, until the property received is sold or otherwise disposed of in a transaction in which gain or loss is recognized.

But this valuation rationale also has its limits. So long as a single dollar in cash or other non-like-kind property ("boot") is received by the taxpayer along with like-kind property, valuation of both properties in the exchange becomes necessary. In that case, the taxpayer is liable for the gain realized, with the maximum liability being on the amount of cash or other "boot" received, under I.R.C. § 1031(b).[9] To compute the gain realized, one must place a value on the like-kind property received. Moreover, the nonrecognition provision applies only to like-kind exchanges, and not to other exchanges in which valuation is just as difficult. Therefore, valuation problems cannot be seen as the controlling consideration in the enactment of section 1031.

In addition to the elusive purpose of the section, there is a second sound reason to question the applicability of Treas.Regs. § 1.1002–1: the long line of cases liberally construing section 1031. If the regulation purports to read into section 1031 a complex web of formal and substantive requirements, precedent indicates decisively that the regulation has been rejected. *See Biggs v. Commissioner*, 69 T.C. 905, 913–14

---

**9.** Section 1031(b) provides:

"If an exchange would be within the provisions of subsection (a), of section 1035(a), of section 1036(a), or of section 1037(a), if it were not for the fact that the property received in exchange consists not only of property permitted by such provisions to be received without the recognition of gain, but also of other property or money, then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property."

(1978).[10] We therefore analyze the Booth transaction with the courts' permissive attitude toward section 1031 in mind.

Two features of the Booth deal make it most likely to trigger recognition of gain: the likelihood that the taxpayer would receive cash instead of real estate, and the time gap in the transfers of the equivalents of fee title.

In assessing whether the possibility that T. J. Starker might receive cash makes section 1031 inapplicable, an important case is *Alderson v. Commissioner,* 317 F.2d 790 (9th Cir. 1963). There, this court held that a "three corner" exchange qualified for nonrecognition treatment. The taxpayer and Alloy entered into an agreement for the simple cash sale of the taxpayer's property, but later amended the agreement to provide that Alloy would purchase another parcel to effect a swap with the taxpayer. This amendment did not totally eradicate the possibility that the cash transaction would take place; it provided, in the words of the court, that "if the exchange was not

effected by September 11, 1957, the original escrow re the purchase for cash would be carried out." 317 F.2d at 791. The exchange was effected when reciprocal deeds were recorded. Said the court:

> "True, the intermediate acts of the parties could have hewn closer to and have more precisely depicted the ultimate desired result, but what actually occurred on September 3 or 4, 1957, was an exchange of deeds between the petitioners and Alloy which effected an exchange of the Buena Park property for the Salinas property." *Alderson v. Commissioner,* 317 F.2d at 793.

The court stressed that, although at the time the contract was amended there was a possibility that a cash sale would take place, there was from the outset no intention on the part of the taxpayer to sell his property for cash if it could be exchanged for other property of a like kind. Thus, *Alderson* followed *Mercantile Trust Co. of Baltimore v. Commissioner,* 32 B.T.A. 82 (1935), a case

---

**10.** For example, courts have held that "three corner" exchanges qualify for section 1031 nonrecognition treatment. In *Biggs,* 69 T.C. 905 (1978), the court described these transactions and summarized the ease with which a taxpayer can use them to qualify for nonrecognition treatment:

> " * * * In such a transaction, the taxpayer desires to exchange, rather than to sell, his property. However, the potential buyer of the taxpayer's property owns no property the taxpayer wishes to receive in exchange. Therefore, the buyer purchases other suitable property from a third party and then exchanges it for the property held by the taxpayer.
> "In numerous cases, this type of transaction has been held to constitute an exchange within the meaning of section 1031. *E.g., Alderson v. Commissioner,* 317 F.2d 790 (9th Cir. 1963); [other citations omitted]. In so holding, the courts have permitted taxpayers great latitude in structuring transactions. Thus, it is immaterial that the exchange was motivated by a wish to reduce taxes. *Mercantile Trust Co. of Baltimore, et al., Trustees v. Commissioner,* [32 B.T.A. 82,] 87 [(1935)]. The taxpayer can locate suitable property to be received in exchange and can enter into negotiations for the acquisition of such property. *Coastal Terminals, Inc. v. United States,* 320 F.2d 333, 338 (4th Cir. 1963); *Alderson v. Commissioner,* 317 F.2d at 793; *Coupe v. Commissioner,* 52 T.C. [394,] 397–

98 [(1969)]. Moreover, the taxpayer can oversee improvements on the land to be acquired (*J. H. Baird Publishing Co. v. Commissioner,* 39 T.C. [608,] 611 [(1962)]) and can even advance money toward the purchase price of the property to be accepted by exchange (*124 Front Street, Inc. v. Commissioner,* 65 T.C. 6, 15–18 (1975)). Provided the final result is an exchange of property for other property of a like kind, the transaction will qualify under section 1031." *Biggs v. Commissioner,* 69 T.C. at 913–14.

In *Biggs,* the Tax Court took this liberal treatment even further. It found that a "four corner" exchange qualified for section 1031 nonrecognition. The party to whom the taxpayer was deeding his property (the "second party") did not want to take title to the property the taxpayer ultimately desired. As a result, the taxpayer advanced money to a syndicate, which bought the desired property from a fourth party and transferred it directly to the taxpayer. The taxpayer then transferred his original property to the second party, and got back his cash advance to the syndicate, ultimately out of the pocket of the second party. Since the various transfers were all part of a single overall plan, the Tax Court found that section 1031 had been satisfied. *See also Coupe v. Commissioner,* 52 T.C. 394 (1969) (similar "four corner" exchange qualifies under section 1031).

in which the taxpayer could have required the other party to the exchange to pay cash if that other party was unable to purchase an identified parcel that the taxpayer desired. In *Mercantile Trust,* the taxpayer succeeded in getting nonrecognition treatment by virtue of its intention to get other property, rather than cash, if possible.

*Coastal Terminals, Inc. v. United States,* 320 F.2d 333 (4th Cir. 1963), held similarly. There, a "three corner" exchange was effected, with both the taxpayer and the other party to the exchange maintaining until the closing the option to cancel the exchange and bring about a cash sale instead. Citing *Alderson* with approval, the court noted that the taxpayer intended to sell the property for cash only if it was unable to locate a suitable piece of property to take in exchange. Because an exchange took place, nonrecognition treatment was granted.

The Fifth Circuit has indicated its agreement with this approach in *Carlton v. United States,* 385 F.2d 238 (5th Cir. 1967). There, the taxpayers gave General an option to purchase their property for cash, but maintained the right to require General to acquire land and transfer it to them in lieu of cash. From the outset, the taxpayers intended to get suitable property, and not cash, in return. As it turned out, at the closing, General transferred to the taxpayers a contract right to purchase two parcels, and enough cash to purchase them, in exchange for the taxpayers' land. Because of the form of payment, section 1031 was held not to apply. But the court noted that the government agreed that had the taxpayers followed the original plan, with General acquiring title and then transferring it to the taxpayers, the section would have applied.

Thus, the mere possibility at the time of agreement that a cash sale might occur does not prevent the application of section 1031. Even in cases such as *Coastal Terminals,* where the taxpayers had the contract right to opt for cash rather than property, a preference by the taxpayers for like-kind property rather than cash has guaranteed nonrecognition despite the possibility of a cash transaction.[11]

In this case, the taxpayer claims he intended from the very outset of the transaction to get nothing but like-kind property, and no evidence to the contrary appears on the record. Moreover, the taxpayer never handled any cash in the course of the transactions. Hence, the *Alderson* line of cases would seem to control.

The government contends, however, that *Alderson* and other precedents of its type are distinguishable. It points out that in those cases, there may have been a possibility of a receipt of cash at the time of the exchange *agreement,* but there was no possibility of receiving cash at the time the taxpayer *transferred* the property pursuant to the agreement. This difference in timing, says the commissioner, renders the *Alderson* line of cases inapplicable.

At least one appellate decision indicates, however, that title may not have to be exchanged simultaneously in order for section 1031 to apply. In *Redwing Carriers, Inc. v. Tomlinson,* 399 F.2d 652 (5th Cir. 1968), the government argued successfully that mutual transfers of trucks that occurred "at or about" the same time were in fact an "exchange" under section 1031. In *Redwing Carriers,* the taxpayer was attempting to deduct a loss in the purchase of new trucks to replace old trucks; the

---

11. Of course, a mere intent to avoid taxation of the transaction is not sufficient. For example, in *Smith v. Commissioner,* 537 F.2d 972 (8th Cir. 1976), the taxpayer bought a parcel of Custer County land. Shortly thereafter, he decided to sever a cotenancy on other land with his brother. He conveyed the Custer County land to his brother for cash, and then his brother transferred the Custer County land back to him in exchange for the taxpayer's share of the cotenancy. The net result of the three transfers was that the taxpayer gave up his share of the cotenancy, and got the Custer County property. His brother gave up cash, and the former owner of the Custer County land got cash. Nevertheless, because the taxpayer purchased the Custer parcel before deciding to make an exchange with his brother, the court refused to view all the exchanges as a whole. The formal transfers of cash to and from the taxpayer's hands defeated the attempt to fit the exchanges within section 1031.

government disallowed recognition of the loss on the ground that section 1031(c) applied.[12] To keep its replacement transactions outside the scope of the section, a parent corporation transferred its old trucks to a subsidiary, bought new trucks for cash, and had the subsidiary sell the old trucks to the manufacturer for cash. The court viewed the transactions as a whole, and disallowed the loss under section 1031. Some lack of simultaneity was apparently "tolerated" by the commissioner and the court. As the court explained, the transfers to the subsidiary by the parent and to the parent by the manufacturer took place "at or about" the same time. 399 F.2d at 655. Nonetheless, the government urges this court to distinguish *Redwing Carriers*, and *Alderson* and its kin, on the ground that the transfers of title in T. J. Starker's case were separated by a "substantial" period of time. We decline to draw this line.

The government also argues that the contract right to receive property or cash was not "like" title to property, because it was like cash. It asks us to impose a "cash equivalency" test to determine whether section 1031 applies. One flaw in this argument is that title to land is no more or less equivalent to cash than a contract right to buy land. The central concept of section 1031 is that an exchange of business or investment assets does not trigger recognition of gain or loss, because the taxpayer in entering into such a transaction does not "cash in" or "close out" his or her investment. To impose a tax on the event of a deed transfer upon a signing of an exchange agreement could bring about the very result section 1031 was designed to prevent: "the inequity * * * of forcing a taxpayer to recognize a paper gain which was still tied up in a continuing investment of the same sort." *Jordan Marsh Co. v. Commissioner*, 269 F.2d 453, 456 (2d Cir. 1959).

■ Against this background, the government offers the explanation that a contract right to land is a "chose in action", and thus personal property instead of real property. This is true, but the short answer to this statement is that title to real property, like a contract right to purchase real property, is nothing more than a bundle of potential causes of action: for trespass, to quiet title, for interference with quiet enjoyment, and so on. The bundle of rights associated with ownership is obviously not excluded from section 1031; a contractual right to assume the rights of ownership should not, we believe, be treated as any different than the ownership rights themselves. Even if the contract right includes the possibility of the taxpayer receiving something other than ownership of like-kind property, we hold that it is still of a like kind with ownership for tax purposes when the taxpayer prefers property to cash before and throughout the executory period, and only like-kind property is ultimately received.

■ The metaphysical discussion in the briefs and authorities about whether the "steps" of the transactions should be "collapsed", and the truism that "substance" should prevail over "form", are not helpful to the resolution of this case. At best, these words describe results, not reasons. A proper decision can be reached only by considering the purposes of the statute and analyzing its application to particular facts under existing precedent. Here, the statute's purposes are somewhat cloudy, and the precedents are not easy to reconcile. But the weight of authority leans in T. J. Starker's favor, and we conclude that the district court was right in *Starker I*, and wrong in *Starker II*. Thus, on the merits, the transfer of the timberland to Crown triggered a like-kind exchange with respect to the Booth property.

---

12. Section 1031(c) provides:

"If an exchange would be within the provisions of subsection (a), of section 1035(a), of section 1036(a), or of section 1037(a), if it were not for the fact that the property received in exchange consists not only of property permitted by such provisions to be received without the recognition of gain or loss, but also of other property or money, then no loss from the exchange shall be recognized."

## IV. SIX PER CENT "GROWTH FACTOR"

The next issue presented is whether the 6 per cent "growth factor" received by T. J. Starker was properly treated as capital gain or as ordinary income. The government successfully argued below that this amount should be treated as ordinary income because it was disguised interest. The taxpayer, on the other hand, contends that the 6 per cent "growth" provision merely compensated him for timber growth on the Columbia County property he conveyed to Crown.

The taxpayer's argument is not without some biological merit, but he was entitled to the 6 per cent regardless of the actual fate of the timber on the property. He retained no ownership rights in the timber, and bore no risk of loss, after he conveyed title to Crown.[13] We agree with the government that the taxpayer is essentially arguing "that he conveyed $1,502,500 to a stranger for an indefinite period of time [up to five years] without any interest." The 6 per cent "growth factor" was "compensation for the use or forbearance of money", that is, for the use of the unpaid amounts owed to Starker by Crown. Therefore, it was disguised interest. See United States v. Midland-Ross Corp., 381 U.S. 54, 57, 85 S.Ct. 1308, 14 L.Ed.2d 214 (1965); Deputy v. duPont, 308 U.S. 488, 497–98, 60 S.Ct. 363, 84 L.Ed. 416 (1940).

## V. TIMING OF INCLUSION

Our final task, having characterized the proper nature of T. J. Starker's receipts, is to decide in which years they are includable in income. The Timian and Bi-Mart properties do not qualify for nonrecognition treatment, while the other 10 properties received do qualify. In this situation, we believe the proper result is to treat T. J. Starker's rights in his contract with Crown, insofar as they resulted in the receipt of the Timian and Bi-Mart properties, as "boot", received in 1967 when the contract was made. We hold that section 1031(b) requires T. J. Starker to recognize his gain on the transaction with Crown in 1967, to the extent of the fair market values of the Timian and Bi-Mart properties as of the dates on which title to those properties passed to his appointee.

We realize that this decision leaves the treatment of an alleged exchange open until the eventual receipt of consideration by the taxpayer. Some administrative difficulties may surface as a result. Our role, however, is not necessarily to facilitate administration. It is to divine the meaning of the statute in a manner as consistent as possible with the intent of Congress and the prior holdings of the courts. If our holding today adds a degree of uncertainty to this area, Congress can clarify its meaning.

As to the disguised interest, the district court erred in holding T. J. Starker liable for ordinary income in 1967. As a taxpayer reporting on the cash method, T. J. Starker was not liable for taxes on interest income until that interest was received. Although receipt may be actual or constructive, Crown's liability for the "growth factor" did not commence until after 1967 had expired. Had suitable properties been found for T. J. Starker in 1967 (as was the case with Bruce and Elizabeth), Crown would have owed T. J. Starker no "growth factor" at all. Therefore, the government should not have assessed an ordinary income tax on the "growth factor" in 1967. The proper years of inclusion would have been those in which the taxpayer received the interest. To the extent T. J. Starker paid the ordinary tax for 1967, he was entitled to his refund.

## VI. CONCLUSION

We affirm the judgment of the district court in part, and reverse it in part. We remand for a modified judgment consistent with this opinion.

Vacated and remanded.

---

13. Starker and Crown, as sophisticated managers of timberlands, presumably knew about fire, blowdown, bugkill, government regulations, and other risks that ordinarily pass with title unless otherwise allocated in transactions spread over time.