**Marshall E. BOYKIN and Jimmie Boykin, Petitioners,**

**v.**

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 21595.**

United States Court of Appeals
Fifth Circuit.

April 28, 1965.

Donald G. Gay, William Bernard Clinton, Dallas, Tex., for petitioners.

Harold C. Wilkenfield, Atty., Dept. of Justice, Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Atty., Dept. of

Justice, Sheldon S. Cohen, Chief Counsel, Eugene F. Colella, Atty., I.R.S., John B. Jones, Acting Asst. Atty. Gen., Harry Baum, Carolyn R. Just, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before MARIS,* RIVES and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

By this Petition for Review, Taxpayer[1] questions the correctness of the Tax Court's decision that he had not "held" a purchased farm in excess of six months and therefore could not treat the gain on its sale as a long-term capital gain within the meaning of § 1222 of the Internal Revenue Code. An additional ground, asserted in the Commissioner's deficiency determination and before this Court as an alternative basis for sustaining the Tax Court's decision, is that capital gain treatment is barred under § 1221(1) because the farm was held "primarily for sale to customers in the ordinary course of his trade or business". We conclude that the Tax Court erred in its decision as to the holding period, and since the alternative ground was not passed on and we do not deem the record sufficient for us to do so initially, the case must be remanded.

During the year 1956 Taxpayer was engaged in the business of subdividing real property and constructing and leasing commercial buildings in the Abilene, Texas area. In February 1956, Taxpayer approached W. O. Hayter, Jr. and offered to buy his farm of approximately 860 acres and a city residence in Abilene. The acreage apparently had speculative appeal by reason of its location near this growing city. An informal agreement was reached on February 25, at which time Taxpayer gave Hayter a check for $3,000. On March 5 the parties executed a formal contract of purchase. The price for both the farm and the city residence was to be $350,000 to be paid by $30,000 in cash and a note of $320,000 (payable over a period of years) with interest on the note to run from the date of the contract, March 5. The contract, supplemented by an addendum two days later, recited that two liens existed against the property, one apparently on the residence,[2] the other on the farm.[3] In the initial agreement, Seller expressly agreed "to pay off said loan [see note 3, supra] at time of closing." In the addendum it was stated that the property would be conveyed free and clear of all liens. This was re-emphasized by the redundant provision that the transaction would not be consummated until the $67,999.98 loan had been paid, Taxpayer's $320,000 note was not to be executed until the transaction was consummated.

But the addendum changed this very positively. Although it reiterated the initial contract's obligation on the Seller to make payments on the secured liens (notes 2 and 3, supra), the addendum expressly prescribed "that buyer shall have the right to pay off such indebtedness in full at any time." In such event the Buyer was to receive credit for the amounts paid against the amount due by him under the serially maturing note installments for principal.

The addendum did not alter the provisions of the initial contract that "taxes for the current year, current rents, insurance, interest (if any), and delay rentals on oil and/or gas leases are to be prorated as of the date of this contract." Likewise, the contract prescribed that Taxpayer agreed to lease-back the farm for agricultural purposes to the Seller for an annual cash rental of $2,500 and

---

* Of the Third Circuit, sitting by designation.

1. Marshall E. Boykin and his wife filed a joint return and both are parties to this suit. For convenience, both will be referred to as "Taxpayer".

2. This secured an $11,495.79 loan made to Hayter by the Southwestern Life Insurance Company.

3. This was to secure a loan of $67,999.98 by the Citizens National Bank of Abilene to Hayter.

this was done.[4] It also provided that the Taxpayer would take possession of the residence by April 1, which, after making improvements, he did.

The addendum made another significant change. It expressly gave the Taxpayer, as Buyer, the right, should the Seller fail or refuse to consummate the contract, to "enforce specific performance." In the initial contract the shoe was practically on the other foot, with the Seller having such right together with liquidated damages through forfeiture of the "down" payment.

On March 6 Taxpayer received a title opinion on the farm showing no defects save the Bank's lien. On March 7 Taxpayer gave Seller a check for $27,000— the remainder of the $30,000 cash down payment—which the check described as "given and received as escrow deposit and/or down payment on the W. O. Hayter, Jr. 868 acre farm; and residence * * * as per contract of March 5, 1956."

Taxpayer testified that he purchased the farm as a "speculative investment," it being his intent to turn it at a profit as soon as possible. His hopes soon became a reality. In pursuit of this objective, he engaged a real estate agent to seek out a buyer, and on April 19, after some negotiation, Taxpayer granted to Jack Hughes a six-month option to purchase the farm for $434,000. The option also provided that if Hughes did not exercise the option, he would pay Taxpayer $8,680. Thus Taxpayer committed himself as owner to convey to another. Hughes chose to exercise the option on October 19, 1956. As was to be expected, there was a traditional, routine closing of the transaction between Seller and Taxpayer. This was held on the same day, October 19, 1956. Hayter delivered to the Taxpayer a warranty deed to the farm and the residence reserving to himself a vendor's lien against the property in the amount of $240,000. Of course the title was still encumbered by the Bank's lien,

and the deed into Taxpayer recited that he had agreed to discharge the Bank loan. Varying only in form from the traditional closing in which money (or new credit) is furnished to discharge an outstanding lien obligation simultaneously with its formal release, Taxpayer satisfied his obligation to pay off the bank loan through his deed simultaneously delivered to Hughes. This warranty deed to Hughes provided that Hughes would pay [1] the balance on the lien held by the Bank, [2] the promissory note Taxpayer had executed to Hayter for $240,000, and [3] would give the Taxpayer a note for $79,765.13 secured by a vendor's lien. Hughes did so, executing a deed of trust to the Taxpayer on this same day. The closing statement also reflected charges and credits. Taxpayer was charged with interest on the $320,000 from the date of the contract (March 5). He was credited with a pro rata share of the rent due him under the lease-back to Hayter from the same date.[5]

On these facts, the Tax Court by an initial and supplemental opinion held that Taxpayer had not "held" the farm for the required "in excess of six months." It reasoned that the word "held", though undefined in the Code, was to be equated with ownership. McFeely v. Commissioner of Internal Revenue, 1935, 296 U.S. 102, 56 S.Ct. 54, 80 L.Ed. 83. It recognized that passage of "legal title" would not be required, but rather a transfer of the "benefits and burdens of ownership" would be sufficient to commence the holding period. Merrill, 1963, 40 T.C. 66; Rev.Rul. 54–607, 54–2 C.B. 177. The Tax Court then proceeded to look to Texas law to ascertain at what point in time the "benefits and burdens of ownership" would have passed from Seller to Taxpayer. This passage was deemed to have occurred when equitable title was transferred. Looking to the "upon whom the loss shall fall" real property cases, Northern Texas Realty & Construction Co. v. Lary, Tex.Civ.App., writ refused,

4. At all times material to this case, the Seller continued to live on and operate the farm.

5. Both were computed on the basis of 226 days.

1911, 136 S.W. 843, as well as those involving equitable remedies for various species of failures to perform in conveyance cases, Continental Southland Savings & Loan Ass'n v. Jones, Tex.Civ.App., 1940, 142 S.W.2d 401; Fink v. Hough, Tex.Civ.App., 1913, 153 S.W. 676, the Tax Court concluded that where the sale contract is "expressly conditional, Texas law provides that the transfer of equitable title does not take place until the conditions have been performed or waived." In view of the fact that the contract here required (1) Seller to deliver abstracts showing a good and marketable title, and (2) to discharge his liability to the Bank, the Tax Court concluded that the contract was conditional, and that the conditions were not removed until the transaction was consummated on October 19. Thus there could have been no passage of equitable title until that date—hence, no transfer of the benefits and burdens of ownership. Therefore, the holding period began and ended on October 19, and Taxpayer's gain from the sale was taxable as ordinary income.

We are of the view (1) that the Tax Court was wrong in its application of the Texas law, and (2) this is bolstered when looked at in the light of the more expansive approach developed in the Tax Court's own guiding decision in this area, Merrill, 1963, 40 T.C. 66, concerning the commencement of the holding period.

As to our first conclusion, under Texas law, a purchaser of realty ordinarily gets equitable title with the execution of a binding contract of sale.[6] Of course it is often said that equitable title does not pass where the contract is by its terms expressly conditional. Northern Texas Realty & Construction Co. v. Lary, Tex. Civ.App., writ refused, 1911, 136 S.W. 843; 52 Tex.Jur.2d Specific Performance § 48. And pointing out that "A contract may be conditional in its inception as to one party and unconditional as to the other," that text speaks in terms of the right to specific performance not being available prior to the time the equitable title passes. Ibid. In other words, the right to specific performance resting on an equitable right frequently measures the time the equitable right comes into being.

When looked at from the vantage of specific performance, several things are clear. First, the Seller was bound absolutely to sell. He was bound to deliver a title and he was therefore bound, as the contract expressly stated, to pay off the bank loan. Second, Taxpayer had the expressed right to compel delivery of the deed and to hold Seller to his bond. If—and the if is a big one—payment by Seller *prior* to closing was ever a condition, the addendum changed it considerably. For now the Buyer had two things. First was the right to compel payment through the enforceable obligation of the Seller to deliver good title. Second was the right in the Buyer to pay all of this loan with credits against installments under the deferred balance promissory note. Since questions of mutuality of remedy[7] are of no moment, it is plain that Taxpayer had the Seller nailed down. The

6. A classic statement of the rule appears in Leeson v. City of Houston, Tex.Com. App. (opinion adopted), 1922, 243 S.W. 485, 488.

"By the great weight of authority it is now held that, although legal title does not pass to the vendee under a contract of sale until actual delivery of a deed to the property still the vendee under such contract of purchase, especially where he goes into possession of the property, is invested with the equitable title from the date of the contract, or in any event, from the date he takes possession, and any increment, advantage, or benefit, and any detriment, depreciation, or loss thereto without fault of either party must be borne by him."

It is interesting to note that equitable title was held to have passed in the Leeson case even though the deal was hinged upon the yet uncompleted collection by the vendor of a promissory note placed in his hands for that purpose by the vendee.

7. "It is not essential that there should have been mutuality of remedy at the time the contract was entered into, it being sufficient if such mutuality exists at the time the suit is filed, or even at the time of the decree." Tex.Jur.2d Specific Performance § 46, and also §§ 44, 45.

courthouse door was open wide. Its judicial storehouse was full of rights, but so far as we can discern, not even the slightest vestige of a possible shadow of a defense was available to the Seller. This makes altogether unimportant, and indeed irrelevant, any testimony concerning Taxpayer's difficulty (or impossibility) in getting the bank to let him assume the Seller's debt. That shoe was on the Seller's foot, not his. And in any event, as it turned out, the Seller did not have to raise any cash, neither did the Buyer.

Although it expressed it more in terms of a waiver by Buyer of the right to require performance of the conditions of title examination showing clear title and payment of the Bank's lien, the Tax Court in its initial opinion recognized as much. It stated that there would have been acceptance by the Buyer of Seller's defective title, had Taxpayer taken possession. But it then found the evidence insufficient to show possession since no formal lease of the farm by Buyer back to Seller was executed, and no rent was paid. On reconsideration it in effect withdrew the statement that no rent was paid, but then declared that the record was in doubt that the credited rent on closing was for use of the farm rather than amounts due Seller from pre-existing leases or perhaps oil and gas leases. Of course, as to the latter there is simply no evidence to warrant any such conclusion. The record compels the finding that the rent credit was for rental of the farm for the precise number of days from execution of the contract to date of formal closing (see note 5, supra), and that consistent with it, the parties regarded the sale as made.

Thus a technical-Texas-law-of-equitable-conversion analysis leads to the conclusion that Taxpayer held the farm for the required time.

■ We are reinforced in this conclusion when we approach the problem in terms of answering this significant question: Is the holding period inquiry a technical one, i. e., do we look alone for the instant when equitable title passes under each state's law, and from that de-

duce that the benefits and burdens have changed hands? Or do we take a practical look at the transaction even though through law colored glasses—at what the parties did—and from that reach a decision as to whether the Taxpayer in question possessed sufficient of the accouterments of ownership—usually styled the benefits and burdens—to justify the conclusion that he "held" the property in excess of six months? The Tax Court appears to have gone both ways. Compare M. E. Boykin, 1964, 22 T.C.M. 1800, with Merrill, 1963, 40 T.C. 66.

We do not find it necessary to determine whether we should follow or apply it as a specific principle, but we think that there is much to support the approach of the Tax Court in the Merrill case (supra) which the Ninth Circuit adopted by its affirmance on the basis of the Tax Court's opinion. Merrill v. Commissioner, 9 Cir., 1964, 336 F.2d 771. There the Tax Court was looking at a holding period from the other end in an attempt to discern at what point the taxpayer disposed of the property to an optionee who took possession of the property and performed other acts of ownership before the time when title would have passed under California law. It is clear from the opinion that there remained some conditions yet to be performed. The optionee had not paid all the purchase price, and the taxpayer-seller had yet to furnish a title policy. Nevertheless the Tax Court held that the Taxpayer's holding period terminated when the optionee took possession, prior to the end of the six-month period, because "for all intents and purposes * *," 40 T.C. at 76, the optionee became the owner at that date. In answering the Taxpayer's argument based on the time of title passage under California law, the Tax Court spelled this out:

"Were we convinced that the date of transfer of legal title alone was conclusive we would look to the California law for that date but we do not agree that the technical refinements of legal title alone determine when a taxpayer's holding period with re-

spect to real property ends for purposes of this statute. * * * Perhaps it would be tidier and more precise if such were the case. But, if that were the case it would be possible for a taxpayer to buy a capital asset one day, sell it the next day at a profit under an escrow agreement which gave the purchaser all the benefits and burdens of ownership immediately but which did not call for delivery of a deed for more than 6 months, and thus get the advantages of the longterm capital gains provisions. We do not think this was intended by Congress." 40 T.C. at 77.

It was emphasized that "taxation is a practical matter." Nowhere did the Tax Court mention the passage of equitable title or any California equivalent. Instead, the Court made an examination of all the circumstances to see if the Taxpayer, for the requisite six months, had possessed the benefits and burdens of ownership—as a practical matter and without regard to the vagaries of California title law.

■ If this approach is applied here, the contract with the addendum and the conduct of the parties reveal that for all practical purposes Taxpayer was possessed of the benefits and burdens of ownership at the critical time. He went into possession of the residence and was also in possession of the farm through his tenant—the Seller and former owner—as called for in the contract, and for which the Tenant-Seller paid the required rent. Likewise, Taxpayer paid interest on his note to Seller from the date of the contract.

8. In the interest of proper judicial administration, cf. United States v. Barnett, 1964, 376 U.S. 681, 694, n. 12, 84 S.Ct. 984, 991, 12 L.Ed.2d 23, 33; Younger Bros., Inc. v. United States, S.D.Tex. (3-Judge), 1965, 238 F.Supp. 859 [Feb. 16, 1965], we think it is appropriate to add the dictum that unless the record on remand reflects more than that the Taxpayer was in the business of subdividing city property and acquired this farm, the first in his career, as a

Taxpayer therefore "held" the property in excess of six months, and is entitled to long-term capital gain treatment unless on remand the Tax Court determines that the farm was held "primarily for sale to customers in the ordinary course of his trade or business." 8

Reversed in part and remanded in part.

speculative investment, we would have serious doubt as to whether this would make him out a dealer as to this property. Investment with the hope that as inflation spirals more and more the property can be sold at a handsome profit is now a common one. That this means that for realization the property must ultimately be sold is a long way from the idea that it is held "primarily for sale to customers in the ordinary course of his trade or business."