Emsy H. SWAIM and Annie Swaim, Plaintiffs-Appellees Cross Appellants,

v.

UNITED STATES of America, Defendant-Appellant Cross Appellee.

No. 79–3244.

United States Court of Appeals, Fifth Circuit.
Unit A

July 27, 1981.

Robert A. Bernstein, Aaron P. Rosenfeld, Ernest J. Brown, M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews, Chief, Appellate Section, Dept. of Justice, Tax Div., Washington, D.C., for defendant-appellant cross appellee.

Thompson, Knight, Simmons & Bullion, Eugene W. Brees, II, Joe A. Rudberg, James Y. Robb, III, Dallas, Tex., for plaintiffs-appellees cross appellants.

Before WISDOM, POLITZ and SAM D. JOHNSON, Circuit Judges.

POLITZ, Circuit Judge:

In 1965, taxpayers Emsy H. and Annie J. Swaim, in unrelated transactions, conveyed two pieces of real property, one located in Hale County, Texas, and the other situated in Concho County, Texas. This appeal involves the federal income tax consequences of those conveyances. The Internal Revenue Service assessed a tax deficiency of $26,430.28 plus interest for the year 1965 based on (1) a taxable gain of $41,771.42[1] in the Hale County property transaction (on the ground that it did not qualify as a nontaxable exchange under Section 1031[2] of the Internal Revenue Code), and (2) under the doctrine of constructive receipt a taxable gain of $25,839.29[3] in the Concho County property transaction during 1965,

---

1. The recognized gain on the Hale County property transaction was computed as follows:

| | |
|---|---|
| Sale price | $101,150.00 |
| Less: basis | 17,607.16 |
| Gain | 83,542.84 |
| Section 1202 LTCG deduction | 41,771.42 |
| Adjustment (recognized gain) | $ 41,771.42 |

2. Section 1031(a) I.R.C. of 1954, 26 U.S.C. § 1031(a) (1974), provides:

(a) *Nonrecognition of gain or loss from exchanges solely in kind.* No gain or loss shall be recognized if property held for productive use in trade or business or for investment (not including stock in trade or other property held primarily for sale, nor stocks, bonds, notes, choses in action, certificates of trust or beneficial interest, or other securities or evidences of indebtedness or interest) is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment.

3. The recognized gain on the Concho County property transaction was computed as follows:

| | |
|---|---|
| Sale price | $64,842.00 |
| Less: basis less depreciation | 13,163.43 |
| Gain | 51,678.57 |
| Section 1202 LTCG deduction | 25,839.29 |
| Adjustment (recognized gain) | $25,839.29 |

instead of 1966 as contended by the taxpayers. In their action for a refund of taxes paid, the Swaims prevailed on the Concho County property issue but were unsuccessful in their § 1031 claim on the Hale County property. Both parties appeal. Finding both transactions taxable, and taxable in 1965, we affirm in part and reverse in part.

## I.  Hale County Property Transaction

On January 8, 1965, the Swaims executed a contract with Mr. and Mrs. E. D. Zimmerman and Mr. and Mrs. M. E. Gary (hereinafter Zimmerman and Gary) involving 238 acres of land owned by the Swaims in Hale County, Texas, and approximately 2,600 acres of land owned by Zimmerman and Gary in Maverick County, Texas.[4] The contract valued the Hale County property at $101,150 and obligated Zimmerman and Gary to pay the Swaims $30,000 in cash, to give them a promissory note in the amount of $29,750, and to take the Hale County tract subject to a $41,400 promissory note previously executed by the Swaims and secured by a deed of trust on the property. In return for the Maverick County property, which was valued at $297,632, the Swaims were to pay Zimmerman and Gary $50,000 in cash, give them promissory notes totalling $102,632, and assume a $120,000 promissory note previously executed by Zimmerman and Gary and secured by a deed of trust on the property and assume a $25,000 improvement loan to be obtained by Zimmerman and Gary which also would be secured by a deed of trust. The $25,000 improvement loan was earmarked for the cultivation of approximately 450 acres of farmland on the Maverick County tract.

Although the contract called for the simultaneous exchange of deeds by April 1, 1965, that plan was changed when it be- came apparent Zimmerman and Gary could not timely meet the conditions of the contract and, inter alia, ready for cultivation the 450 acres of farmland. Instead, on February 5 and 6, 1965, Zimmerman and Gary executed and delivered to Swaim general warranty surface and mineral deeds granting to the Swaims[5] the Maverick County property. Swaim decided not to record these deeds because the additional acreage was not yet in cultivation, the additional loan had not been secured and an updated abstract had not been furnished as required. Swaim placed the deeds in escrow pending compliance with all of the terms of the January contract. Some three months later Zimmerman and Gary completed the requirements of their agreement and, on May 14 and 15, 1965, new general warranty surface and mineral deeds were executed and delivered to the Swaims in substitution for the February 5 and 6 deeds that had been placed in escrow. Notwithstanding the then obvious inability of Zimmerman and Gary to complete timely their obligations under the January 8 contract, on February 2, 1965, the Swaims executed and delivered to Zimmerman and Gary the deed to the Hale County property; this deed was recorded and the transaction was completed.

In their tax return for the year 1965, the Swaims treated the Hale County property transaction as a nontaxable exchange under § 1031. From their perspective, each aspect of the agreement was a mutually interdependent part of an integrated plan, i. e., each transaction was contingent upon the successful completion of the entire transaction. The Swaims contend that an "exchange" is evidenced by the following transfer of assets and liabilities:

---

4.  As permitted by the agreement, the Swaims formed a corporation (Swaim Farms, Inc.) to receive the surface rights to the Maverick County property. The mineral rights, in turn, went to the Swaims individually. The IRS contends that even though the corporation is wholly owned by the Swaims, it constitutes a separate and distinct taxpayer and therefore there was no conveyancing *to and from the same taxpayer* as required by § 1031. In other words, the taxpayers-sellers were the Swaims in their personal capacity, while the taxpayers-buyers were not only the Swaims in their personal capacity, but also a corporation. Because that apparently novel issue does not alter the conclusion to which we are guided, we defer its decision to another day.

5.  *See* note 4 *supra.*

|  | Swaims to Zimmerman and Gary | Zimmerman and Gary to Swaims |
|---|---|---|
| Cash | $ 50,000 | $ 30,000 |
| Notes | 102,632 | 29,750 |
| Mortgage | 145,000* | 41,400 |
| Hale County property (FMV) | 101,150 | -- |
| Maverick County property (FMV) | -- | 297,632 |
| Total Transfer | $398,782 | $398,782 |

\* Includes $25,000 improvement mortgage.

The government, on the other hand, insists that there was no "exchange" within the meaning of § 1031, but rather that there were two separate and distinct transactions:

*Transaction No. 1*: Sale by Swaims of Hale County property.

|  | Zimmerman and Gary to Swaims | Swaims to Zimmerman and Gary |
|---|---|---|
| Cash | $ 30,000 | -- |
| Notes | 29,750 | -- |
| Assumption of mortgage | 41,400 | -- |
| Hale County property (FMV) | -- | $101,150 |
| Total Transfer | $101,150 | $101,150 |

*Transaction No. 2*: Purchase by Swaims of Maverick County property.

|  | Zimmerman and Gary to Swaims | Swaims to Zimmerman and Gary |
|---|---|---|
| Cash | -- | $ 50,000 |
| Notes | -- | 102,632 |
| Assumption of mortgage | -- | 145,000 |
| Maverick County property (FMV) | $297,632 | -- |
| Total Transfer | $297,632 | $297,632 |

The foundation for the government's position is the three month delay in the delivery and recording of the Maverick County property deeds. On February 2, 1965, when the Swaims conveyed their Hale County land and received consideration in full, the completion of the conveyance of the Maverick County land was still conditional and uncertain, a status which continued until mid-May.

In enacting § 1031, which provides that no gain or loss shall be recognized if property held for productive use in a trade or business or for investment is "exchanged" solely for property of a like kind, Congress sought to defer taxation of a gain or loss "when in theory the taxpayer may have realized gain or loss, but in substance his economic interest in the property has remained virtually unchanged by the transaction." *Redwing Carriers, Inc. v. Tomlinson*, 399 F.2d 652, 656 (5th Cir.1968). Taxpayers have been allowed wide latitude in structuring qualifying transactions,[6] adher-

6. *See, e. g., W. D. Haden Co. v. Commissioner of Internal Revenue*, 165 F.2d 588 (5th Cir. 1948), where an individual purchased property from a third party with the intent of exchanging this property for property held by the taxpayer, but the individual never acquired legal title to the property. We nevertheless sanctioned tax-free exchange treatment, holding that the buyer may direct the third party to deed his property directly to the taxpayer so

ing to the "well established principle that the substance of a transaction, rather than the form in which it is cast, ordinarily determines its tax consequences." *Biggs v. Commissioner*, 69 T.C. 905, 914 (1978), *aff'd*, 632 F.2d 1171 (5th Cir.1980). As noted by the Tax Court in *Earlene T. Barker v. Commissioner*, 74 T.C. 555, No. 42 (June 10, 1980), however, application of the principle within a logical framework is often a troublesome task:

> The "exchange" requirement poses an analytical problem because it runs headlong into the familiar tax law maxim that the substance of a transaction controls over form. In a sense, the substance of a transaction in which the taxpayer sells property and immediately reinvests the proceeds in like-kind property is not much different from the substance of a transaction in which two parcels are exchanged without cash. *Bell Lines, Inc. v. Unites States*, 480 F.2d 710, 711 (4th Cir.1973). Yet, if the exchange requirement is to have any significance at all, the perhaps formalistic difference between the two types of transactions must, at least on occasion, engender different results. Accord, *Starker v. United States*, 602 F.2d 1341, 1352 (9th Cir.1979).

At the outset, we accept as true the Swaims' contention that both parties to the contract *intended and agreed* that there would be an exchange of properties which would fall within the ambit of § 1031. In support of this contention, the Swaims insist that from the beginning of their negotiations with Zimmerman and Gary they insisted that as a part of the consideration for the transfer of their Hale County property, they receive like kind property in exchange. However, "[w]hile it is true that the incidence of taxation is to be determined by viewing the entire transaction as a whole, *Kanawaha Gas & Util. Co. v. C.I.R.*, 214 F.2d 685 (5th Cir.1954), that rule does not permit us to close our eyes to the realities of the transaction and merely look at the beginning and end of a transaction without observing the steps taken to reach that end." *Carlton v. United States*, 385 F.2d 238, 241 (5th Cir.1967), *citing C.I.R. v. Court Holding Co.*, 324 U.S. 331, 334, 65 S.Ct. 707, 89 L.Ed. 981 (1945). Had the Swaims followed their original plan whereby Zimmerman and Gary would have completed the required improvements to the Maverick County tract prior to the transfer of deeds, presumptively the Swaims would have been permitted to postpone the recognition of gain pursuant to § 1031. The alteration in plans, as perceived by the government, transformed an arguably qualified exchange into a taxable sale and purchase.

In *Carlton, supra*, the taxpayers, who had given an option on their ranch property, negotiated to acquire other ranch property which they wished to receive in a § 1031 tax-free exchange. The optionee contracted to buy the other property but never acquired title to it. Instead, the optionee paid cash for the taxpayers' property and assigned to the taxpayers its contractual right to acquire the other property. Two days later the taxpayers purchased the other property, using the money received from the optionee to close the transaction. In finding that the transaction constituted a sale by the taxpayers and a purchase of other property, we addressed the issue of the differences between a sale and an exchange, stating: "The very essence of an exchange is the transfer of property between owners, while the mark of a sale is the receipt of cash for the property." *Id.* at 242, *citing W. D. Haden Co. v. Commissioner of Internal Revenue*, 165 F.2d 588 (5th Cir.1948). In addition, we placed particular emphasis on whether the cash was earmarked for the subsequent purchase, noting that the receipt of money which is unfettered or unrestrained signifies a sale of property.

long as the cash paid to the third party is transferred directly from the buyer to the third party and not through the taxpayer. *See also Starker v. United States*, 602 F.2d 1341 (9th Cir.1979), permitting § 1031 treatment where the person who desires the taxpayer's property acquires and holds another piece of property only temporarily before exchanging it with the taxpayer.

In the case *sub judice*, the district court found that the Swaims received cash and promissory notes for the Hale County property; they did not receive any other property. The funds received by the Swaims were totally unrestricted; the Swaims were under no obligation to purchase the Maverick County property until Zimmerman and Gary met certain conditions, including the making of certain improvements to the land, an event which might never have occurred.[7] As noted previously, these improvements were in fact not completed until mid-May 1965, more than three months after the Swaims transferred title to the Hale County property.

In *Redwing, supra*, the taxpayer had entered into several contracts by which it both disposed of and acquired diesel tractor trucks from a supplier. Rejecting the taxpayer's characterization of the transactions as a series of sales and repurchases, we confirmed the district court's finding that there existed a "definite contractual interdependency between the sale of new trucks and trade-in of old trucks." *Id.* at 655. We distinguished that case from the decision in *Carlton*, stating (*Id.* at 659):

> In *Carlton* . . . the taxpayer had received, in return for property, cash which was not restricted in use to the purchase of like property. The most that could be said for the transactional relationship in *Carlton* was that the sale for cash between the taxpayer and a purchaser had been *complementary* with the later purchase of like property between taxpayer and a seller.

In the instant case the district judge correctly applied the rationale of *Carlton* and *Redwing*, stating:

> Like the transactions in *Carlton*, [the Hale and Maverick County property transactions] were at most "complementary;" they lacked the "contractual interdependence" that the Fifth Circuit has held is so essential to an exchange. *Redwing Carriers, Inc. v. Tomlinson*, 399 F.2d 652, 655, 659 (5th Cir.1968). Not only were the transactions severable; they were in fact severed. *Id.* at 659. The taxpayer sold to the buyer his property for cash and notes, then later purchased from the buyer like property.

The "analytical problem" posed by the exchange requirement aptly pointed out by the Tax Court in *Earlene T. Barker, supra*, can indeed, as in the instant case, cause obviously harsh results. "But there is no equity in tax law, *Henderson Clay Products v. United States*, 324 F.2d 7, 12 (5 Cir.1962), and such must be the result if the limitation in § 1031 to exchanges is to have any meaning." *Carlton*, 385 F.2d at 243.

The judgment of the district court with respect to the Hale County property transaction must be and is AFFIRMED.

## II. *Concho County Property Transaction*

On November 20, 1965, the Swaims executed a general warranty deed conveying to D. D. Cluff approximately 650 acres in Concho County, Texas. As consideration, Cluff

---

7. We reject appellants' contention that equitable title to the properties simultaneously passed upon execution of the January 8, 1965 contract. In *Boykin v. C.I.R.*, 344 F.2d 889 (5th Cir.1965), we addressed this issue in the context of determining the taxpayer's holding period of certain real property in computing long or short-term capital gain treatment pursuant to 26 U.S.C. § 1222. Applying Texas law to the case then before us, we found a direct correlation between the right to specific performance and the passing of equitable title:

> [U]nder Texas law, a purchaser of realty ordinarily gets equitable title with the execution of a binding contract of sale. Of course it is often said that equitable title does not pass where the contract is by its terms expressly conditional . . . . And pointing out that "a contract may be conditional in its inception as to one party and unconditional as to the other," that text speaks in terms of the right to specific performance not being available prior to the time the equitable title passes . . . . In other words, the right to specific performance resting on an equitable right frequently measures the time the equitable right comes into being.

*Id.* at 892. In the case at bar it is clear that equitable title to the Maverick County tract did not pass until mid-May, 1965, the date on which Zimmerman and Gary finally satisfied the condition in the contract concerning improvements to 450 acres of farmland. At that time the deeds were delivered and legal title passed.

agreed to pay $64,842, represented by seven promissory notes totaling $30,842 and the assumption of $34,000 of the balance of a promissory note previously executed by the Swaims in favor of the John Hancock Life Insurance Company. The John Hancock note was secured by a mortgage on the Concho County tract. In November 1965, the total liability to John Hancock was $35,000; the Swaims, however, agreed to make one final payment of $1,000 on the note on January 1, 1966. This agreement also provided that the Swaims were to pay all accrued interest as of January 1, 1966, and all taxes on the Concho County property through the close of 1965. The Swaims retained the right to all income from the property for the remainder of 1965. Because the parties did not wish to complete the conveyance in November 1965, the deed and seven promissory notes were placed in escrow with the Phoenix Title and Trust Company.

On November 23, 1965, Cluff entered into an agreement to exchange the Concho County property for land owned by Mr. and Mrs. J. H. Stansberry. In addition to the exchange of lands, the Stansberrys agreed to assume all of Cluff's liabilities arising out of the Swaim-Cluff transaction. On December 1, 1965, Cluff executed a deed to the Concho County property to the Stansberrys. Because the contract provided that the transaction would close *after* January 1, 1966, however, all pertinent instruments and funds were placed in escrow, with the Phoenix Title and Trust Company. All parties were aware of the terms of the Swaim-Cluff and Cluff-Stansberry agreements.

To facilitate a smooth closing of the Cluff-Stansberry transaction, the escrow agent sent to the Swaims, on December 15, 1965, the deed to the Concho County property that they had executed in favor of Cluff on November 20, 1965. As requested, Mr. Swaim recorded the deed in Concho County to establish the link in Cluff's chain of title. On December 15, 1965, the escrow agent also sent to the Swaims the seven promissory notes that Cluff had executed in their favor, with instructions that the notes be marked "paid" and returned to the

agent. The agent's letter to Mr. Swaim stated: "It is our understanding that we are to withhold $30,842.00 of Mr. Stansberry's money until the notes have been returned to us." The notes were marked paid per these instructions and returned on either December 29 or 30. The Swaims did not receive payment, however, until after January 1, 1966.

There is no dispute that the seven promissory notes aggregating $30,842 and the $34,000 mortgage liability assumed by Cluff must be included as part of the amount realized by the Swaims on the sale of the Concho County property. The issues presented are: (1) did the district court properly conclude that the $30,842 should have been reported in 1965 rather than 1966, and (2) did the district court properly conclude that the $34,000 was reportable in 1966 rather than in 1965.

A. *Constructive Receipt of Payment of Seven Promissory Notes*

■ The district court found that the Swaims "had both the power and the right to receive payment on the notes as early as December 15, 1965," the date on which the escrow agent mailed to the Swaims the seven promissory notes. Although payment was not actually made on the notes until after January 1, 1966, the doctrine of constructive receipt mandates inclusion of the payment on the notes in 1965. The applicable tax regulation provides:

> Income although not actually reduced to a taxpayer's possession is constructively received by him in the taxable year during which it is credited to his account, set apart for him or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given. However, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions.

Treas.Reg. § 1.451–2, 26 C.F.R., T.D. 6723, 1964–1 Cum.Bull. 73. *See also* 2 Mertens,

*Federal Income Taxation* § 10.01, at 2 (rev. ed. 1967) ("It is now well settled that income which is subject to a taxpayer's unfettered command and which he is free to enjoy at his own option is taxed to him as his income whether he sees fit to enjoy it or not."), *quoted with approval in United States v. Hancock Bank,* 400 F.2d 975, 979 (5th Cir. 1968).

The Swaims maintain that the escrow agreement imposed "substantial limitations or restrictions" which precluded them from obtaining payment on the notes prior to January 1, 1966. There is a dearth of proof of the precluding terms of the agreement; we find only the testimony of Mr. Swaim that he understood he could not receive payment on the notes until after January 1, 1966.[8] Other evidence reflects that at any time after December 15, 1965, the escrow agent was willing to pay the $30,842 to the Swaims. The record does not support appellants' contention that there was an impediment to the receipt of payment.

Under these circumstances we cannot denote as clearly erroneous the district court's finding that the Swaims' right to receive payment in 1965 was not subject to substantial restrictions. *See Allen v. C. I. R.,* 514 F.2d 908 (5th Cir. 1975). We affirm the ruling of the district court that the $30,842 realized from the sale of the Concho County property was reportable in tax year 1965.

**B.** *Assumption of Mortgage Liability*

In November 1965, Cluff agreed to assume $34,000 of the Swaims' liability to the John Hancock Insurance Company. The travail in determining the proper year of inclusion of this gain in the Swaims' taxable income results from their agreement to make one final payment on the note on January 1, 1966. The district court found that the $34,000 liability was not assumed until 1966, and that therefore the Swaims could properly report that portion of the gain in 1966. We disagree.

An assumption of a mortgage constitutes a promise to pay the underlying liability. *See Barber v. Federal Land Bank of Houston,* 204 S.W.2d 74 (Tex.Civ.App.1947). When Cluff entered into the November 1965 agreement to assume the mortgage, he unconditionally promised to pay and then became the ultimate obligor for $34,000 of the balance of the mortgage obligation. That Cluff did not assume the other $1,000 is not relevant to the issue of when the assumption came into being.

We find of assistance the decision of our colleagues in the Ninth Circuit in *Ledford v. United States,* 492 F.2d 1186 (9th Cir. 1974), which addresses the question whether a taxpayer had received more than thirty percent of the sale price in the year of sale. In *Ledford* an escrow agreement provided that the purchasers were to assume the mortgage on the acquired real estate as a condition precedent to the closing of escrow in 1966. In resolving that the purchaser assumed the mortgage in 1966, as opposed to 1967 when the seller was to make a final payment, the court stated:

> The fact that one payment of principal and interest remained to be made by the seller the following year ... does not mean that the purchasers' assumption of the balance was deferred until after that payment. The question is not when payments were due, but when the purchasers legally relieved the sellers of final responsibility to pay off the balance and accepted that responsibility in their stead.

*Id.* at 1187.

As in *Ledford,* the record in the case at bar establishes that Cluff, in 1965, legally relieved the Swaims of the ultimate responsibility to pay the $34,000 mortgage balance and "accepted that responsibility in their stead." In 1965 the Swaims executed the deed to the Concho County property, re-

---

8. Q. Did you understand, Mr. Swaim, if you were free to take those promissory notes and exchange them for other notes or to declare them due?

A. I did not. I was to return them to the escrow account.

Q. Did you understand that you were not to receive any cash in payment for those notes until after January 1st, 1966?

A. Yes, sir, that's correct.

corded it and delivered it to the escrow agent. There can be no question but that for tax purposes the sale was consummated and the consideration was received in 1965.

The judgment of the district court holding that the Swaims did not realize gain on the $34,000 assumed mortgage until 1966 is REVERSED; that gain was realized in 1965. In all other respects the judgment of the district court is AFFIRMED.