**In re William Harold COLLUM, a/k/a Harold Collum Company and Mattie Merelyne Collum, Debtor.**

**Bankruptcy No. 390–30452 RCM–7.**

United States Bankruptcy Court,
N.D. Texas,
Dallas Division.

May 21, 1991.

William R. Cousins, III, William A. Roberts, Dallas, Tex., for debtor.

Louise P. Hytken, Susan R. McLean, Dept. of Justice, Tax Div., Dallas, Tex., for IRS.

FINDINGS OF FACT AND CONCLUSIONS OF LAW ON DEBTORS' OBJECTIONS TO THE IRS PROOF OF CLAIM

ROBERT C. McGUIRE, Chief Judge.

Following are the Court's original, amended and supplemental findings of fact

and conclusions of law with respect to the trial on January 18, 1991, the argument on January 25, 1991, and the motion of William Harold Collum, a/k/a Harold Collum Company, and Mattie Merelyne Collum ("Debtors", or individually "Mr. Collum" or "Mrs. Collum") for reconsideration with respect to Debtors' objections to the proof of claim filed by Internal Revenue Service ("IRS"):[1]

### Findings of Fact

1. Debtors timely filed their 1987 tax return on June 15, 1987. Debtors timely amended their 1987 tax return on November 8, 1987.

2. Debtors purchased 7.85 acres in Tarrant County, Texas, in 1981.

3. Debtors purchased 133.31 acres in Dallas County, Texas in 1981.

4. On July 17, 1986, Debtors entered into contracts to sell both parcels to a publicly-held corporation, Interwest Corporation ("Interwest"), of which Mr. Collum owned 50.18% of the stock. He owned such percentage of the stock during all times in question herein.

5. Interwest agreed to pay Mr. Collum with the issuance of stock, in such an amount that Mr. Collum would have had over 80% of the stock of Interwest had the transactions been completed. Mr. Collum's goal in these transactions was to obtain Internal Revenue Code § 351 non-tax treatment on the transactions and increase his holding in Interwest.

6. The contract price for the Tarrant County property was 37,200 shares of Interwest stock and the assumption by Interwest of a loan from Metropolitan Financial Federal Savings & Loan Association ("Metropolitan") in the amount of $375,000. Debtors' tax basis in this property was $201,988.27.

7. The contract price for the Dallas County property was 438,506 shares of Interwest stock and the assumption by Interwest of a promissory note from Valley Federal Savings & Loan ("Valley") in the amount of $4,000,000. Debtors' tax basis in this property was $1,727,757.07.

8. On September 1, 1987, but effective August 1, 1987, Mr. Collum unconditionally signed a Special Warranty Deed to the 7.858 acres in Tarrant County to Interwest (IRS Exhibit ("Ex.") 7).

9. Debtors signed a general warranty deed to the 133.31 acres in Dallas County to Interwest on March 31, 1987. The deed stated that part of the consideration was the issuance to Debtors of 438,506 shares of Interwest stock. This had not and did not happen (IRS Ex. 6).

10. Interwest never issued either the 37,200 shares of stock or the 438,506 shares of stock to Debtors, or Mr. Collum individually.

11. The contracts on the Tarrant and Dallas Counties properties both initially called for a closing date of September 5, 1986 (Debtors' Ex. 5). Both contracts contained two conditions precedent. First, the holder of the underlying loan would have to consent to the transfer and the assumption. Second, the board of directors and shareholders of Interwest would have to agree to the transaction.

12. Both contracts also specifically called for Interwest to deliver fully-executed stock certificates to Mr. Collum at closing. This was never done.

13. Closing did not take place by September 5, 1986 on either transaction.

14. On March 31, 1987, Mr. Collum and Interwest signed a document to reinstate and amend the expired Dallas County contract (Debtors' Ex. 4). The "amended contract" adopts all the terms of the prior July 17, 1986 contract except that the closing date was changed to April 15, 1987 (Debtors' Ex. 4). The closing did not occur on April 15, 1987.

15. On July 31, 1987, Mr. Collum and Interwest signed a document to reinstate and amend the July 31, 1986 contract for the sale of the 7.85 acres in Tarrant Coun-

---

**1.** It would clarify the record on this matter to have all the findings of fact and conclusions of law set forth in one place rather than partially being incorporated by reference per the order signed February 22, 1991, and entered February 26, 1991.

**796**

ty, Texas (Debtors' Ex. 6, Stipulated Fact 14). The only amendment in the "amended contract" was the substitution of the closing date from September 5, 1986 to September 15, 1987 (Debtors' Ex. 6, Stipulated Fact 14). The closing on the July 31, 1987 contract did not occur by September 15, 1987.

16. IRS asserts a tax liability of $964,-676.53.

17. On September 18, 1990, Debtors filed a timely objection to IRS's proof of claim.

18. Neither Metropolitan nor Valley agreed to the assumptions by and transfers to Interwest before September 5, 1986.

19. Mr. Collum testified that the deal kept "rolling and mutating" as it went along. This was credible testimony. Mr. Collum further testified that he tried to keep the deal alive, hoping to get collateral value for the stock. However, at the time Mr. Collum made the transfers of the real estate to Interwest (Findings of Fact 8 and 9), and represented that the 438,506 shares of stock were partial consideration for the transfer (IRS Ex. 6), Mr. Collum was aware that the stock had not yet been delivered, and of reasons why Interwest would not be able to deliver the stock (see Finding of Fact 22). No effort was made to rescind the transactions represented by the deeds and assumptions within a reasonable time. Insertion of Interwest in the chain of liability may have accomplished some temporary respite of credit demands on Debtors from Valley and Metropolitan; however, there was no specific testimony on this.

20. Interwest never made any payments to Valley or Metropolitan after the assumption, although Valley and Metropolitan showed the 1987 interest payments being made by Interwest.

21. No effort was made by Debtors to rescind the deeds to Interwest, and the properties were not foreclosed until 1988 and 1989, with a deficiency.

22. In 1987, Mr. Collum had no reason not to close the Interwest stock sale except for fear of a derivative shareholder liability suit arising out of the matters referred to in the Securities and Exchange Commission ("SEC") correspondence. He was in desperate financial condition at that point in time. Interwest could not pay past due American Stock Exchange ("ASE") fees. Interwest could not pay ASE new shares registration costs. In addition, Interwest lacked the funds necessary to pay its transfer agent for past due bills, as well as the costs involved in the issuance of the new shares. Interwest lacked funds to pay for the required filings of 10Ks with SEC.

23. After the assumptions of the Valley and Metropolitan debts, Interwest was insolvent.

24. The board of directors of Interwest did not meet between July 31 and September 15, 1987.

25. If Interwest had gone through with the transaction as initially proposed, SEC would have required Interwest to carry the properties at Mr. Collum's adjusted basis, rather than at fair market value, thereby giving Interwest a negative net worth.

26. Metropolitan required that Mr. Collum personally borrow $71,500 to pay for appraisal fees, title reports, mortgage insurance, recording fees, attorney fees, etc. as a condition to the assumption and transfer to Interwest (Debtors' Ex. 8).

27. If the 37,200 shares of Interwest stock had been issued, Metropolitan would have required such shares to be pledged to it on the Metropolitan debt (IRS Ex. 11, p. 2).

28. Under the Mr. Collum/Interwest Assumption and Indemnity Agreement, with respect to the Metropolitan transaction, Interwest agreed, effective August 1, 1987, to indemnify and hold Mr. Collum harmless (IRS Ex. 10, p. 2 ¶ 2).

*Conclusions of Law*

■ 1. As shown by IRS Ex. 8, Valley consented to Interwest's assumption. This was signed March 31, 1987 by Valley, Debtors, and Mr. Collum for Interwest, as purchaser. Valley required Debtors to execute a guaranty as part of the "assumption by Interwest. In addition, Debtors were

not relieved of liability on the loan by Interwest's "assumption".

2. On September 1, 1987, an assumption agreement was signed whereby Metropolitan agreed to the transfer to and the assumption by Interwest of the mortgage on the 7.85 acres. A warranty deed was also executed on the same date (IRS Exs. 7 and 10). The deed specifically states that 37,-200 shares of Interwest stock were part of the consideration. This had not and did not happen (IRS Ex. 7). IRS Ex. 13 dated August and September, 1987, shows Metropolitan consented to the assumption by Interwest. This was signed by Mr. Collum, individually and for Interwest, and by Metropolitan. Per Paragraph 5 of Ex. 13, Mr. Collum remained liable on such note. Also see IRS Ex. 9, the deed of trust to secure the assumption.

3. As far as Valley and Metropolitan were concerned, this was a binding transaction on Interwest, and it appears that Debtors lacked power to rescind the assumption transactions insofar as Valley and Metropolitan were concerned.

4. It appears that the deeds and assumptions were likewise binding on Debtors tax-wise.

5. There was a sale or disposition of property within § 1001 of the Internal Revenue Code, so Debtors must include the amount of the outstanding mortgages in the amount of gain realized under § 1001(b).

6. The transfer of the properties to Interwest by the deeds recorded in the public records, the substitution of the corporation as the primary obligor on the debts, and a subsequent approximate two years of dealing prior to foreclosure between Debtors and Interwest, in which there was no attempt to rescind the contracts, was sufficient to shift the benefits and burdens of ownership of the properties to Interwest for tax purposes.

7. The transfer of the Tarrant County and Dallas County properties to Interwest constituted a "sale or other disposition of property" for purposes of § 1001 of the Internal revenue Code. The consideration for these transfers was Interwest's assumption of the outstanding liabilities on the properties irrespective of the continued personal liability of Mr. Collum. I.R.S. Reg. 1.1001–2(a)(4)(ii); *Estate of Juden v. C.I.R.*, 865 F.2d 960 (8th Cir.1989); *Commissioner v. Tufts*, 461 U.S. 300, 103 S.Ct. 1826, 75 L.Ed.2d 863 (1983); *Owen v. C.I.R.*, 881 F.2d 832 (9th Cir.1989); *Evangelista v. C.I.R.*, 629 F.2d 1218 (7th Cir. 1980).

8. These properties were transferred to Interwest within the meaning of § 1001. For federal tax purposes, "ownership of real property is acquired either upon the delivery of the deed or upon transfer of the benefits and burdens of ownership of the property, whichever occurs first". *Dettmers v. C.I.R.*, 430 F.2d 1019, 1023 (6th Cir.1970); *Morrison v. United States*, 449 F.Supp. 654, 661 (N.D.Ohio 1977); *Major Realty Corp. and Subsidiaries v. C.I.R.*, 749 F.2d 1483, 1486 (11th Cir.1985); *Bradford v. United States*, 444 F.2d 1133, 1142, 195 Ct.Cl. 500 (1971); *Merrill v. Commissioner*, 40 T.C. 66, 74 (1963).

This position was first adopted by the United States Tax Court in *Merrill, supra,* wherein it stated:

> Normally, ownership of real estate would be considered transferred on the date of delivery of the deed. But where delivery of the deed is delayed to secure payment of the purchase price or for some other reason such as the escrow arrangement here involved, we believe the intent of the parties as to when the benefits and burdens of ownership of the property are to be transferred, as evidenced by factors other than passage of bare legal title, must control for purposes of this statute.

40 T.C. at 74. *Merrill* is not analogous to the case at bar. The issue in *Merrill* was whether a taxpayer had "held" property for the necessary holding period for purposes of § 1231. The Court found that the transfer of the deed was not necessary to establish ownership, for ownership could be discerned by when the benefits and burdens of ownership of the property transferred.

In this case, deeds were delivered by Debtors to Interwest, and, subsequently recorded in the appropriate deed records, and Interwest assumed the underlying real estate liabilities. It further appears that the benefits and burdens of ownership of the property have passed to Interwest.

■ Debtors direct this Court to *Swaim v. United States*, 651 F.2d 1066 (5th Cir. 1981) and *Boykin v. C.I.R.*, 344 F.2d 889 (5th Cir.1965), for the proposition that a transfer does not occur, under Texas law, until the benefits and burdens have been transferred.

Debtors fail to note that these cases follow the general rule espoused above. *Boykin* dealt with the same issue as examined in *Merrill*, whether the duration of ownership was sufficient so as to fall within a holding period. After noting that the Tax Court had failed to follow *Merrill*, the Court found that, regardless of the date of the deed transfer, which was seven months after the execution of the contract of purchase, the benefits and burdens of ownership had transferred, and thus, the taxpayer had held equitable title for the requisite time.

In *Swaim*, the taxpayer argued that equitable title had passed the date the contract was executed, notwithstanding the deed transfer several months later. The Court found that equitable title did not pass until the completion of conditions set forth in the contract.

This Court does not believe that *Boykin* or *Swaim* set forth a rule that a transfer of property occurs only when the benefits and burden of ownership pass, but that these cases follow and support the general rule set forth in *Merrill* and referred to above.

■ 9. Debtors argue that the step transaction doctrine applies in this situation. They argue that this Court cannot determine the tax consequences of one transaction that was intended as one in a series of transactions, without looking at the overall purpose. In short, they argue that this Court must look at what they intended to do, not what they actually did. They ask this Court not to put form over substance.

In *Security Industrial Insurance Co. v. United States*, 702 F.2d 1234 (5th Cir.1983), Judge Goldberg wrote:

> ... Under the step transaction doctrine, 'the tax consequences of an interrelated series of transactions are not to be determined by viewing each of them in isolation but by considering them together as component parts of an overall plan.' *Crenshaw v. United States*, 450 F.2d 472, 475 (5th Cir.1971). When considered individually, each step in the series may well escape taxation. The individual tax significance of each step is irrelevant, however, if the steps when viewed as a whole amount to a single taxable transaction. *Id.* at 476. '[Taxpayers] cannot compel a court to characterize the transaction solely upon the basis of a concentration on one facet of it when the totality of circumstances determines its tax status.' *Id.* at 477.

The purpose of this doctrine is to ensure that the tax consequences of a particular transaction turn on its substance, not its form. *Id.* at 1245. In this instance, there is no "series of transactions", but only a single transaction, although initially intended to be but one of two. In substance, with knowledge of the impediments to issuance of the Interwest stock (Findings of Fact 19 and 22), Debtors transferred the properties to Interwest and Interwest assumed the outstanding liabilities on the property. No recission was ever attempted by Debtors within a reasonable time. Although some terms of the contracts were never fully complied with, a taxable event did result. This Court finds that the step transaction doctrine is not applicable in this instance. The Supreme Court "has observed repeatedly that, while a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice whether contemplated or not". *Commissioner v. National Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134, 149, 94 S.Ct. 2129, 2137, 40 L.Ed.2d 717 (1974); *Estate of Juden, supra.*

10. In their final argument, Debtors assert that the gain, if any, is not includible in gross income under § 108 of the Internal Revenue Code. In relevant part, § 108 reads:

§ 108. Income from discharge of indebtedness

(a) Exclusion from gross income.—

(1) In general.—Gross income does not include any amount which (but for this subsection) would be includible in gross income by reason of the discharge (in whole or in part) of indebtedness of the taxpayer if—

(A) the discharge occurs in a title 11 case,

(B) the discharge occurs when the taxpayer is insolvent....

Debtors argue that they qualify under this section since they were insolvent in 1987, the year in which the transactions occurred. This theory was first espoused in Debtors' motion for reconsideration.

In light of the Supreme Court decision in *United States v. Centennial Savings Bank F.S.B.*, — U.S. —, 111 S.Ct. 1512, 113 L.Ed.2d 608 (1991), this Court finds § 108 inapplicable in this instance. In *Centennial*, Justice Marshall found that the term "discharge of indebtedness", as used in § 108, conveys "forgiveness of, or release from, an obligation to repay". *Id.* at —, 111 S.Ct. at 1517. He continues in n. 6, by writing:

'Discharge' can be used to signify various means of extinguishing a legal duty. See generally Black's Law Dictionary 463 (6th ed. 1990). Thus, a debtor might be said to 'discharge' his debt by satisfying it. But § 108 uses 'income by reason of the discharge ... of indebtedness' to refer to the change in the debtor's financial condition when the debtor is no longer legally required to satisfy his debt either in part or in full. 'Discharge' in this sense can occur only if the creditor cancels or forgives a repayment obligation.

*Id.* Justice Marshall concluded that "Congress did not intend to extend the benefits of § 108 beyond the setting in which a creditor agrees to release a debtor from an obligation assumed at the outset of the relationship." *Id.* at — – —, 111 S.Ct. at 1519.

Neither Valley nor Metropolitan agreed to release Debtors from their obligation on the mortgages. As a condition for Valley and Metropolitan's consent to the transfer of the properties to Interwest and the assumption of liabilities, Debtors were required to execute a guaranty on the same indebtedness. These obligations were neither canceled or forgiven. Thus, it cannot be said that Debtors were discharged from this indebtedness, within the meaning of § 108.

11. This Court finds that the transfer of the properties to Interwest constituted a sale or disposition of property for which a gain was realized by Debtors. Consequently, Debtors' objection to the timely filed IRS proof of claim is hereby

OVERRULED.