CHARLES W. MARS AND RUBY G. MARS, Petitioners, v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Mars v. Commissioner
Docket No. 26999-82.
United States Tax Court
T.C. Memo 1987-481; 1987 Tax Ct. Memo LEXIS 477; 54 T.C.M. (CCH) 636; T.C.M. (RIA) 87481; September 22, 1987. *479 Joe Vaulx Crockett, for the petitioners. Gary Walker, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent determined deficiencies in petitioners' Federal income tax and additions to tax as follows: Income Tax
Additions to Tax
Year
Deficiencies
Sec. 6651(a)(1)
Sec. 6653(a)
1977
$ 79,071.03
$ 11,885.11
-
1978
19,403.51
-
$ 970.18
After concessions, [1] the issues for decision are (1) whether the conveyance by petitioners of certain property referred to herein as the "golf course property" constitutes an exchange of like kind property subject to the tax deferral rules of section 103I, or a taxable sale of real property; (2) whether petitioners are liable for interest income in the amount of $ 22,201.01 in taxable year 1977 and $ 5,091.70 for taxable year 1978, in connection with the disposition of the golf course property; (3) whether petitioners are entitled to a bad debt deduction in the amount of $ 26,000 for funds transferred to their son in 1978; (4) whether petitioners are entitled to the depreciation claimed with respect to certain equipment in 1977 and 1978; (5) *480 whether petitioners are liable for the delinquency addition pursuant to section 6651(a)(1) for 1977; and (6) whether petitioners are liable for the negligence addition pursuant to section 6653(a) for 1978. FINDINGS OF FACT Petitioners Charles W. Mars (Charles and Ruby G. Mars (Ruby), are married and their legal address was in Oakridge, Tennessee at the time they filed their petition in this case. Petitioners filed joint Federal income tax returns for taxable years 1977 and 1978 with the Internal Revenue Service Center in Memphis, Tennessee. On November 14, 1974 petitioners signed a document captioned "Short Form Option Agreement" giving Henry Hudson (Hudson), an irrevocable right to purchase a 250 acre "golf course tract" (golf course property), for a purchase price undisclosed in the document but later agreed upon by the parties. Hudson gave petitioners at least $ 40,000 in cash for the option. [2]
*481 On March 24, 1976 petitioners signed a document captioned "Contract to Purchase Real Estate in Anderson County, Tennessee" (Hereinafter referred to as Purchase Contract I), wherein petitioners agreed to sell the golf course property to Hudson in consideration for a purchase price of $ 800,000. Purchase contract I utilized language characterizing petitioners as the "seller" and Hudson as the "purchaser" of the golf course. The $ 800,000 purchase price was satisfied as follows: Cash downpayment
$  50,000
Hudson's assumption of petitioners'
first mortgage note to Seeber
300,000
Hudson's promissory note to petitioners
450,000
Total to petitioners:
$ 800,000
Purchase Contract I provided that the $ 50,000 cash downpayment had been previously paid to petitioners. [3] Hudson's promissory note for $ 450,000 (Hudson note) was payable to petitioners with simple interest at 10 percent per year computed from April 24, 1976 as follows: (1) principal payments of $ 50,000 each due on December 31, 1976, 1977, 1978, 1979, 1980 and 1981; (2) principal payment of $ 150,000 due on December 31, 1982; and (3) 10 percent interest on the unpaid balance due every six months *482 beginning June 30, 1976. On May 12, 1976 petitioners signed a closing statement showing that they were entitled to receive the Hudson note for the sale of the golf course property. Hudson was given credit for making the $ 50,000 cash downpayment and for assuming a $ 300,000 mortgage on the property owed to Seeber. Petitioners incurred closing costs of $ 1,765 on this transaction. On May 14, 1976 petitioners conveyed the golf course property by warranty deed to Hudson in consideration for the $ 800,000 purchase price. The May 14, 1976 warranty deed recited that Hudson had assumed a deed of trust on the golf course owed to Seeber in the amount of $ 300,000. Hudson assumed this debt. On May 14, 1976, Hudson signed and delivered to petitioners the Hudson note in the amount of $ 450,000. The Hudson note was secured by a deed of trust on the golf course property. In addition, on May 14, 1976 petitioners entered into a security agreement with Hudson to secure *483 payment of the Hudson note. The security agreement was collateralized by certain "goods." [4] owned by Hudson. On May 14, 1976 petitioners signed a separate agreement transferring possession of the golf course property to Hudson on or before May 24, 1976. Some time after the May 14, 1976 closing, Hudson informed petitioners that he was financially unable to pay in cash the indebtedness evidenced by the Hudson note. Upon being informed that Hudson could not perform on the note, petitioners allegedly informed Hudson that the transaction was cancelled. The cancellation of Purchase Contract I was allegedly documented by a "cancellation letter" drafted by petitioners' now deceased attorney, Dwight Cortland, and delivered to Hudson by petitioners and Mr. Cortland. [5] At no time did petitioners receive a warranty deed of reconveyance from Hudson nor did petitioners otherwise reinvest themselves with title to the golf course property pursuant to the default provisions of the Hudson note, the security agreement or the deed of trust. *484 On December 31, 1976 petitioners and Hudson entered into a Contract to Purchase Real Estate (hereinafter referred to as Purchase Contract II) wherein Purchase Contract II agreed to purchase from Hudson three parcels of real property known individually as the "Wilson Sporting Goods Building", the "Sky Harbor Apartments", and the "Burger Chef Restaurant"; and known collectively as the "Sky Harbor Complex." Purchase Contract II provided that the purchase price for the Wilson Sporting Goods Building was $ 174,331.42 which was to be paid $ 50,00 upon the execution of the contract and the remaining $ 124,331.42 by petitioners assuming an existing indebtedness encumbering the Wilson Sporting Goods Building. The combined purchase price for the Burger Chef Restaurant and Sky Harbor Apartments was stated as $ 623,502.31, to be paid as follows: (1) $ 250,00 in cash to be paid by petitioners when Hudson delivered to them deeds conveying the remaining property; (2) a promissory note in the amount of $ 100,00 payable to Hudson from petitioners due and payable January 10, 1978, and bearing interest at the rate of 10 percent per annum; and (3) the balance of $ 273,502.31 by petitioners taking title *485 to this property subject to existing deeds of trust. Pursuant to Purchase Contract II, petitioners received four separate warranty deeds from Hudson reflecting the transfer in ownership of the Sky Harbor Complex. A warranty deed conveying title to the Wilson Sporting Goods Building to petitioners was dated December 31, 1976. That deed was notarized on January 29, 1977 and recorded on February 17, 1977. A warranty deed conveying title to the Sky Harbor Apartments and adjoining tract of land to petitioners was signed and notarized on April 12, 1977 and recorded on May 16, 1977. A warranty deed conveying title to Burger Chef Restaurant, and a warranty deed conveying title to a strip of land around the Sky Harbor Complex to petitioners were both signed on February 2, 1978, notarized on February 4, 1978, and recorded on April 10, 1978. On April 18, 1977 Hudson and petitioners executed an instrument captioned "Substitution of Collateral" which released from the deed of trust securing the Hudson note all of the property described in said deed of trust and substituting therefor as collateral Hudson's Burger Chef Restaurant property. As provided in the substitution of collateral agreement, *486 a deed of trust dated April 12, 1977 evidencing the encumbrance on the Burger Chef was recorded in Nashville, Davidson County, Tennessee. Also on April 18, 1977 petitioners and Hudson exchanged receipts, each in the amount of $ 250,000. Hudson acknowledged receipt of $ 250,000 from Charles for "equity on apartment & office complex." Petitioner acknowledged receipt of $ 250,000 from Hudson for "payment o note" with "balance due $ 100,000." On February 2, 1978 petitioners and Hudson again exchanged receipts. Hudson acknowledged receipt of $ 100,000 from petitioners for "purchase of Burger Chief (sic) property known as part of Sky Harbor Complex, in the Second Civil District, of Davidson County, in Nashville, Tennessee." Petitioners acknowledged receipt of $ 100,000 from Hudson for "release of Burger Chef property known as part of Sky Harbor Complex, in the Second Civil District, of Davidson County, in Nashville, Tennessee." Petitioners did not cancel the Hudson note in 1976; nor did petitioners release the deed of trust or any other security interest in the golf course property in that year. On April 28, 1978 petitioners signed a "Full Release of Trust Deed" for the golf course *487 property stating that petitioners acknowledged "the payment in full of said indebtedness and the satisfaction and discharge of said Deed of Trust." Hudson had legal title to the golf course property at all times after it was conveyed to him in May of 1976. At no time did petitioners attempt to have title reconveyed to them after the alleged rescission of Purchase Contract I. Petitioners retained a lien on the property until its release. In connection with their acquisition of the Sky Harbor Complex, petitioners entered into a Management Agreement with Hudson, dated December 31, 1976, which provided that petitioners "have acquired title to the Sky Harbor Complex" and further provided that Hudson would continue to operate and manage the complex. The agreement provided that Hudson would pay all the operating expenses, would pay petitioners $ 3,333.00 per month, and would be entitled to retain any excess from the income from operation of the property. On June 21, 1978, petitioners and Hudson terminated the management agreement, effective May 31, 1978, and petitioners took over the management and operation of the Sky Harbor Complex. None of the aforementioned documents, including *488 Purchase Contract I, Purchase Contract II or any of the deeds, notes, security agreements or receipts reflected any of the above property transfers as an exchange. The only documentary evidence in the record directly or indirectly referring to the property transfers as an exchange is a letter dated December 30, 1976 from a vice president of Commence Union Bank to Hudson which reads as follows: "Per our discussions today regarding the release of the Wilson Sporting Goods property and the Sky Harbor property which we presently have a lien on, Commerce Union Bank will release the Wilson Sporting Goods property immediately to facilitate your property swap in Clinton, Tennessee. However, the remaining Sky Harbor property will not be released until final endorsement is received from GNMA on the Millwood II project. This includes release of the letters of credit, as well as repayment of the loans advanced against retainage on this project." On their Federal income tax returns for 1976, 1977 and 1978 petitioners reported the golf course property transfer to Hudson as an installment sale rather than a like kind exchange. In his statutory notice of deficiency, respondent determined that *489 petitioners' long-term capital gain from the sale of the golf course was $ 384,082.02 and $ 62,524.98 in 1977 and 1978, respectively, rather than $ 63,495 and $ 58,964.94 as reported on petitioners' returns. Petitioners did not claim the property transactions constituted a like kind exchange until respondent issued the statutory notice of deficiency. Interest Income
On their 1977 Federal income tax return, petitioners reported receiving interest income in the amount of $ 10,000. No mention was made on the return as to the source of the income. In his statutory notice, respondent determined that petitioners realized interest income in the amount for $ 32,200.01 in 1977 and $ 5,091.70 in 1978. Respondent determined petitioners' interest income by treating the golf course transactions as a sale rather than an exchange and by treating the Sky Harbor Apartments, Wilson Sporting Goods Building and Burger Chef Restaurant as payments received by petitioners on the Hudson note. Respondent determined that the Sky Harbor Apartment and Wilson Sporting Goods Building were received by petitioners in 1977, that petitioners received the Burger Chef Restaurant in 1978 and that each property *490 had the following value at the date of receipt: Property
Determined Value
Sky Harbor Apartments
$ 342,400
Wilson Sporting Goods Building
225,550
Burger Chef Restaurant
91,400
Purchase Contract II listed the following sales prices, liens and equity [6] for each parcel of property: Property
Sales Price
Liens
Equity
Wilson Sporting Goods Building
$ 174,331.42
$ 124,331.42
$  50,000
Sky Harbor Apartments and
Burger Chef Restaurant, combined
623,502.11
273,502.11
350,000
Total
$ 797,833.52
$ 397,833.53
$ 400,000
Bad Debt Deduction
On or about July 18, 1978 petitioners advanced funds to their son, James W. Mars (James), in the amount of $ 26,000. The funds were used as a deposit by James' company, Thunder Mountain Coal Company, Inc. (Thunder Mountain), for the acquisition of heavy mining equipment, two "haulback trucks." The transfer of the $ 26,000 to James was evidenced by a Promissory Note from James to the order of petitioners dated July 18, 1978. The *491 Promissory Note reads as follows: 7-18-1978 $ 26,000 On demand after date I or we promise to pay to the order of Charles W. Mars and wife, Ruby G. Mars twenty-six thousand and no/hundred dollars for value received, payable at 200 Elza Dr., Oakridge, TN., plus 10% interest with reasonable attorney's fee if collected by law. The makers and endorsers of this note hereby severally waive presentment for payment, notice of nonpayment, protest and consent that the time the payment may be extended without notice thereof. Loan for two haul back trucks /s/ James W. Mars Petitioners intended for James' company to use this equipment to strip mine coal on certain property owned by petitioners' corporation, Melton Hill Recreational Development Corporation (Melton Hill). Melton Hill leased the property to James in exchange for a fixed royalty on all coal mined. The trucks were deemed by the parties as essential to James' mining process. The haulback trucks purchased proved to be defective and unusable and therefore James was unable to mine petitioners' property. James subsequently transferred, or subleased his rights as lessee to an entity known as Ru-El Coal Company, Inc. (Ru-El), *492 pursuant to a lease dated September 6, 1978. Ru-El subsequently filed for bankruptcy. Thunder Mountain defaulted on its obligations to pay for the haulback trucks and the trucks were sold by creditors pursuant to a private sale conducted on or after December 8, 1978. James and/or Thunder Mountain were unable to repay the $ 26,000 transferred by petitioners to James. Petitioners never received any royalty income in connection with the lease between their company, Melton Hill and James or from James' subleae with Ru-El. In a schedule caption "Calculations of Royalty Income" attached to their 1978 Federal income tax return, petitioners claimed a deduction captioned "Forfeited deposit on machinery - $ 26,000," which respondent disallowed in his statutory notice of deficiency. In their petition, petitioners allege that the $ 26,000 claim should be allowed as a bad debt. Equipment Depreciation
In 1977 petitioners owned a tract of land near Interstate I-75 in Lake City, Tennessee. In 1977 the tract's geographic surface consisted of a hole that was about 1,000 feet across and about 30 feet deep. Next to the hole on the same tract was a mountain. In 1977 and 1978, petitioners *493 used a "high lift," bulldozer and truck to move dirt from the moutain to fill in the hole. Except for filling the hole, petitioners' high lift, bulldozer and truck were used for no other purpose in 1977 and 1978 other than an unspecified amount of "reclamation" On Schedule F attached to petitioners' 1977 and 1978 Federal income tax returns, petitioners claimed depreciatin expenses on the high lift, bulldozer, truck and a tractor [7] in the amount of $ 9,353.77 and $ 9,881.34, respectively. Respondent disallowed the depreciation claimed in 1977 and 1978 in the amounts of $ 8,375 and $ 8,695, respectively. Delinquency Addition
Petitioners timely filed, on or before April 15, 1978, a Form 4868 "Application for Automatic Extension of Time to File U. S. Individual Income Tax Return," which allowed petitioners an "automatic" two-month extension of time until June 15, 1978 to file their 1977 Federal income tax return. A second request for extension was filed by petitioners [8] and received by respondent on July 6, 1978. Respondent notified petitioners that their 1977 Federal income tax *494 return was due on July 15, 1978. Petitioners' undated 1977 Federal income tax return was received by respondent on September 19, 1978. Respondent determined that petitioners' 1977 return was mailed on September 15, 1978 and determined that petitioners' failure to file their return during the three-month period from June 15, 1978 to September 15, 1978 was without reasonable cause. Respondent determined a delinquency addition of $ 11,885.11 pursuant to section 6651(a)(1) in his statutory notice of deficiency for petitioners' 1977 taxable year. Negligence Addition
Petitioners failed to report certain royalties and other items of taxable income on their 1978 return. In his statutory notice of deficiency, respondent determined that part of the underpayment of petitioners' tax for 1978 was due to negligence or intentional disregard of rules and regulations, and determined a negligence addition of $ 970.18 for 1978 pursuant to section 6653(a). OPINION Disposition of Golf Course Property
The first issue for decision is whether *495 the gain realized on the disposition of petitioners' golf course property qualifies for nonrecognition under section 1031 or is taxable as a sale of real property. Section 1031(a), as in effect during the year in issue, provided that: No gain or loss shall be recognized if property held for productive use in trade or business or for investment * * * is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment.
See also section 1.1031(a)-1, Income Tax Regs. The requirements of section 1031 are thus threefold: (1) there must be an exchange; (2) the properties exchanged must be of a like kind; and (3) the property transferred and the property received must be held by the taxpayer either for use in a trade or business, or for investment. The parties do not dispute that the last two requirements have been complied with; [9] rather, the dispute centers on the first requirement, whether there was an exchange. At the heart of section 1031 is a requirement that there *496 must be an exchange of like-kind business or investment properties, as distinguished from a sale of the property. this requirement has been repeatedly addressed when the taxpayer sells property for cash and then reinvests the proceeds in other like kind property. See, e.g., Barker v. Commissioner,74 T.C. 555. 57-=571 )109- ' Swaim v. United States,651 F.2d 1066, 1069-1070 (5th Cir. 1981); Starker v. United States,602 F.2d 1341, 1352 (9th Cir. 1979); Smith v. Commissioner,537 F.2d 972, 975-976 (8th Cir. 1976), affg. a Memorandum Opinion of this Court; Carlton v. United States, 3855 F.2d 238, 241 (5th Cir. 1967); Rogers v. Commissioner,44 T.C. 126, 133 (1965), affd. per curiam 377 F.2d 534 (9th Cir. 1967). The inherent difficulty in drawing such distinctions is the weight that must be given the form of a transaction rather than its substance. As we stated in Barker v. Commissioner, supra at 561: The "exchange" requirement poses an analytical problem because it runs headlong into the familiar tax law maxim that the substance of a transaction *497 controls over form. In a sense, the substance of a transaction in which the taxpayer sells property and immediately reinvests the proceeds in like-kind property is not much different from the substance of a transaction in which two parcels are exchanged without cash. Bell Lines, Inc. v. United States,480 F.2d 710, 711 (45h Cir. 1973). Yet, if the exchange requirement is to have any significance at all, the perhaps formalistic difference between the two types of transactions must, at least on occasion, engender different results. Accord, Starker v. United States,602 F.2d 1341, 1352 (9th Cir. 1979). We must first analyze the form in which the subject property transfers were cast and determine whether that form more closely resembles an exchange or a sale. Next we must decide whether the transactions' form conflicts with its economic substance or the intent of the parties. While intent alone in like kind transfers is not sufficient ( Carlton v. United States, supra), it is relevant to a determination of what transpired. Biggs v. Commissioner,69 T.C. 905 (1978), affd. 632 F.2d 1171 (5th Cir. 1980). *498 The burden of proving that disposition of petitioners' golf course property qualifies as a like kind exchange under section 1031 is on petitioners. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Furthermore, where the taxpayer seeks to avoid the form of his own agreement, a higher level of proof, known as the "strong proof standard" is required. See Coleman v. Commissioner,87 T.C. 178, 201-203 (1986), on appeal (3d Cir., Mar. 10, 1987); Major v. Commissioner,76 T.C. 239, 247 (1981). See also Schulz v. Commissioner,294 F.2d 52, 55 (9th Cir. 1961), affg. 34 T.C. 235 (1960). On May 14, 1976, petitioners and Hudson entered into Purchase Contract I wherein petitioners sold the golf course property to Hudson for $ 800,000. thereafter, on or about December 31, 1976, petitioners and Hudson entered into a separate contract, Purchase Contract II, wherein Hudson sold different but similar real estate to petitioners. Petitioners concede that Purchase Contract I was structured as a cash sale of petitioners' property and that the parties had no intention at that time of exchanging properties. Petitioners *499 claim however that upon learning of Hudson's inability to perform on the Hudson Note that the parties subsequently agreed to rescind Purchase Contract I and complete an exchange of like-kind property. Charles testified that the rescission was evidenced by a letter drafted by Mr. Cortland, petitioners attorney who is now deceased, signed by Charles and subsequently delivered to Hudson. Petitioners were unable to produce this letter. [10] The only documentary evidence in the record referencing an exchange of real property is the December 30, 1976, letter from Commerce Union Bank to Hudson wherein the bank agreed to release its lien on the Wilson Sporting Goods Building to "facilitate your property swap in Clinton, Tennessee." The form chosen by the parties to document the real property transfers was a sale, not an exchange. We find no reason to conclude that the parties intended a different result than *500 that represented by the documents they signed. We find it curious that if petitioners and Hudson had intended to rescind Purchase Contract I and restructure the transaction as an exchange of like kind property that Purchase Contract II would make no reference to either the previous contract, its rescission or the intent of the parties to link the transfer of property from Hudson to petitioners to the transfer of real property from petitioners to Hudson. Petitioners only explanation for the failure of the documents to refer to the transfers as an exchange was Charles' desire to eliminate the legal fees which would have been incurred in redrafting the documents. Such an explanation is not credible given that Purchase Contract II was signed, and presumably drafted, after the alleged rescission of Purchase Contract I and after the parties had allegedly agreed to restructure the transaction as an exchange. The documentation of Purchase Contract II was very detailed and precise. It seems only reasonable that the parties would insist that the second purchase contract accurately reflect the substance of an exchange, if they had so intended, particularly if they purposefully intended *501 it to be an exchange rather than sale. [11] In this context, a failure of Purchase Contract II to mention the transfer of property as an exchange lends support to respondent's argument that on December 31, 1976, the parties did not in fact intend to restructure the transaction as an exchange, but rather petitioners agreed to accept the Sky Harbor Complex as payment on the Hudson note. Additional factors indicate that the two real estate transactions were in neither substance nor form a like kind exchange. It is not clear that passage of title to petitioners' golf course property and Hudson's Sky Harbor Complex was reciprocal or interdependent as required in a like kind exchange. Section 1.1002-a(d), Income Tax Regs. Title to petitioners' golf course property passed to Hudson by warranty deed executed on May 14, 1976. Title to Hudson's Wilson Sporting Goods Building, passed to petitioners by warranty deed dated December 31, 1976. Title to Hudson's Sky Harbor Apartments passed *502 to petitioners by warranty deed dated April 12, 1977 and title to Hudson's Burger Chef Restaurant passed to petitioners by warranty deed dated February 2, 1978. By way of partial explanation, petitioners state on brief, "One reason for the exchange being partially deferred appears to be that the parcels comprising the Sky Harbor complex were encumbered with various liens in order for Hudson to convey clear title to petitioners." The Commerce Union Bank letter may help explain why title to the Sky Harbor Apartments and Burger Chef Restaurant was not conveyed on or about December 31, 1976, as was the Wilson Sporting Goods property. However, petitioners have failed to establish that the subsequent transfers of the Sky Harbor Apartments and the Burger Chef Restaurant coincided with the release of the Commerce Union Bank liens on those parcels. But even if so this would indicate that Hudson was not in a position to transfer those properties to petitioner as part of an exchange. Although not determinative, it is also interesting to note that on their 1977 and 1978 Federal income returns petitioners treated the disposition of their golf course property as an installment sale. It was *503 not until respondent issued his statutory notice of deficiency that petitioners characterized the disposition as a like kind exchange. We are aware that the transfers of property in this case show some attributes normally associated with a like kind exchange. Contrary to respondent's repeated assertions, there is no evidence that any cash was exchanged between petitioners and Hudson other than the $ 50,000 option price which was later categorized by the parties as an earnest money deposit. [12]
We conclude that petitioners have failed in their burden to establish that the transactions in question qualified, either in form or substance, as a like kind exchange. Purchase Contract II, signed after the alleged rescission of Purchase Contract I, is curiously devoid of any reference to Purchase Contract I, the desire of the parties to exchange property in lieu of the cash sale, or of a reciprocal transfer of property. Apart from the Commerce Union Bank letter, which merely reflects the understanding of a third party not directly involved in the transaction, there is *504 a total absence of documentary evidence to support the contention that the parties intended and in fact accomplished an exchange of property. [13]
The absence of any statement or testimony of Hudson is particularly damaging to petitioners' case. If petitioner and Hudson intended to rescind a carefully drawn written agreement and substitute an entirely different agreement therefor it should surely have been evidenced in writing. Charles' only explanation was that he didn't want to pay additional legal fees for such a document. But legal fees must have been paid for the deed conveying the Wilson Sporting Goods property to petitioner. But in any event Hudson had to agree to the purported charge in the agreement, and he was the best person to testify about the transaction. The burden of proof was on petitioner not only to prove that the transaction was more than it appeared to be but also to disprove the validity of respondent's determinations. Petitioners' failure to introduce *505 testimony of Hudson gives rise to the presumption that if produced it would have been unfavorable to petitioners. Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158 (1946), affd. 162 F.2d 513 (105h Cir. 1947). We re left with only the unsubstantiated testimony of Charles that a rescission of Purchase Conract I did in fact occur and that petitioners and Hudson restructured the transfers as a like kind exchange. We cannot accept such self-serving testimony to sustain a burden of proof without substantiating documentation. [14]
Interest Income Having decided that the disposition of petitioners' golf course property constituted a taxable sale, we must now determine whether petitioners received taxable interest income of $ 22,201.01 in 1977 and $ 5,091.70 in 1978 arising from the transaction. Respondent determined that the three properties comprising the Sky Harbor Complex received by petitioners constituted *506 payments on the Hudson note. Although it is not clear from his notice of deficiency or trial briefs, apparently respondent determined that the aggregate value of the Sky Harbor Complex less the $ 450,000 face value of the Hudson note represented an interest element received by petitioners. Petitioners' only response to respondent's interest income determination is that they realized no interest income on the Hudson note because the transfer of the golf course property became part of an exchange rather than a sale and the note and interest due thereon was cancelled. As stated above, we find that the disposition of the golf course property was not a like kind exchange within the meaning of section 1031. However, we find no evidence to support the value respondent assigned to the Sky Harbor Complex, which conflicts with that set forth in Purchase Contract II. Respondent introduced no evidence at trial nor made any reference in respondent's briefs as to how he determined the value. Under these circumstances, we find the most reliable evidence of the value of the Sky Harbor Complex is Purchase Contract II. the contract embodies the agreement of a willing buyer and a willing seller *507 as to the value of the property. Respondent has introduced no evidence to suggest that the agreed purchase price was understated. [15] Additional interest income attributable to petitioners, if any, should be based upon the sales price of the three properties listed in Purchase Contract II less liens attributable thereto. Accordingly, the value of the Wilson Sporting Goods Building is determined to be $ 50,000 and the combined value of the Sky Harbor Apartments and the Burger Chef Restaurant is $ 350,000. An issue has been raised whether the transfer of the Wilson Sporting Goods property from Hudson to petitioners took place in 1976, as claimed by petitioners, or in 1977 as claimed by respondent. Since petitioners were the buyers of this property, rather than the sellers, this issue would appear to have little significance in this case. However, since the issue may have some bearing on the computation of petitioners' gain upon the sale of the golf course property we will discuss it briefly. Respondent *508 argues that because Hudson's signature on the deed to the Wilson property was not notarized until January 29, 1977 and the deed was not recorded until February 17, 1977, the property was not transferred until 1977. Petitioner argues that the deed was signed and delivered to petitioners on December 31, 1976, and the transfer occurred in 1976, a year not before the Court. We do not agree with respondent tha under Tennessee law title does not pass until a deed is acknowledged and recorded. Section 66-5-106 of the Tennessee statute provides that "No deed of conveyance for land * * * shall be good and available in law, as to strangers, unless the same be acknowledged by the vendor * * *." (Emphasis added.) And section 66-22-101 of the Tennessee law provides in part "to authenticate an instrument for registration, its execution shall be acknowledged by the maker * * *." (Emphasis added.) However, it is evident that those statutes were intended to require authentication of a deed only to give it effect as to third parties. Under Tennessee law, deeds are good as between the parties without registration. Wilkins v. McCorkel,112 Tenn. 688, 80 S.W. 834 (1904); *509 Hinton v. Robinson,51 Tenn. App. 1, 364 S.W. 2d 97 1962). Title passes between the parties upon execution and delivery of the deed. Respondent suggests that the deed was backdated but offered no evidence to support the suggestion. We find it hard to understand why if the parties were brought together for the express purpose of executing the deed, as claimed by petitioners, and particularly if timing was important, why the attorneys present did not have a notary present to notarize the signature. And, also, why someone present at the meeting was not called as a witness to affirm delivery of the deed on December 31, 1976. But the only evidence offered was the deed itself which states on its face that it was dated and signed December 31, 1976. We find that petitioners received title to the Wilson Sporting Goods property in 1976. Bad Debt Deduction
Petitioners seek to deduct the $ 26,000 transfer to their son, James, primarily as a business bad debt under section 166(a)(1). [16]
*510 Section 166(a) allows a deduction for business bad debts that become worthless within the taxable year. Regulations provide that to be entitled to a deduction under section 166(a) there must first be a bona fide debt. A bona fide debt "arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money." Section 1.166 Income Tax Regs. No deduction may be taken (1) for a loan, repayment of which is contingent upon some event, or (1) for a loan made without a reasonable expectation, belief and intention that the advance be repaid. Zimmerman v. United States,318 F.2d 611 (9th Cir. 1963). Intra-family transactions are subject to rigit scrutiny and are particularly susceptible to a finding that the transfer was intended as a gift rather than a debt. Estate of Van Anda v. Commissioner,12 T.C. 1158, 1162 (1949), affd. per curiam 192 F.2d 391 (2d Cir. 1951). Charles testified the purpose of the "loan" was to allow James to acquire two haulback trucks to be used in mining petitioners' property. Charles testified he thought that sufficient income would be produced from the *511 mining activities to satisfy James' royalty obligations under the lease agreement with petitioners and to serve as a source of repayment of the $ 26,000 "loan". However, it is not clear that petitioners intended James to repay the money if, as was the case, the mining operation proved unsuccessful. Petitioners failed to call James to testify. We are again denied the opportunity to examine the motives and intent of a crucial party to the transaction. Petitioners introduced no evidence as to James' experience in conducting such mining operations or whether it was reasonable to expect that enough profit would be generated to pay royalties and service a $ 26,000 debt. We do not know, for example, whether any profit has ever been produced in previous years. When asked whether he made any effort to collect on the loan when James' efforts failed, Charles replied, "You can't get blood out of a turnip." There is no indication that James' financial condition was any better at the time the loan was made than it was at the time of default. We find that the transfer to James was too contingent to give rise to creditor-debtor status; and even if not contingent, petitioners failed to show *512 that the "loan" was made with reasonable expectation that it would be repaid. Petitioners failed to establish that the transfer constituted a valid debt within the meaning of section 166, and no deduction is allowable thereunder. [17]
Equipment Depreciation
Petitioners claimed a depreciation deduction in 1977 and 1978 on a bulldozer, high lift, truck and tractor as part of a farm loss, which respondent disallowed. Petitioners assert that they should be allowed depreciation on the bulldozer, high lift and truck [18] because that equipment was either "property used in the trade or business" or "property held for the production of income: within the meaning of the depreciation rules of section 167. The equipment was used to fill in a large hole in petitioners' property. The deduction for depreciation, whether for property used in the trade *513 or business or property held for the production of income, is allowable under section 167 only in cases in which a taxpayer has engaged in an activity with the objective of making a profit. Lemmen v. Commissioner,77 T.C. 1326, 1340 (1981); Jasionowski v. Commissioner,66 T.C. 312, 319 (1976). Section 1.183-2(b)(1)-(9), Income Tax Regs., sets forth nine factors which should be considered in examining taxpayers' profit objective.[19]
Petitioners have failed to establish their profit objective, if any, for entering into the *514 activities which required the heavy equipment in issue. Accordingly, petitioners have not proven their entitlement to a depreciation deduction under section 167. Delinquency Addition
Petitioners timely filed an automatic extension of time to file their 1977 Federal income tax return. The extension allowed petitioners to file their 1977 return on or before June 15, 1978. On or about July 6, 1978, petitioners filed a second extension request. Respondent received the second extension request on July 6, 1978 and extended petitioners' 1977 return due date to July 15, 1978. Charles testified that he could not remember receiving any notice from respondent with respect to the second extension request. Petitioners' undated return for 1977 was not received by respondent until September 19, 1978. Respondent determined that petitioners were liable for the delinquency addition under section 6651(a) (1) for failure to timely file their 1977 Federal income tax return. Section 6651 imposes an addition to the tax for failure to timely file a Federal income tax return unless it is shown that such failure is due to reasonable cause and not due to willful neglect. Petitioners bear the *515 burden of proving such reasonable cause. Baldwin v. Commissioner,84 T.C. 859, 870 (1985). To establish reasonable cause petitioners must show that they used ordinary reasonable care and prudence in preparing and filing their return. Sanders v. Commissioner,225 F.2d 629 (10th Cir. 1955), affg. 21 T.C. 1012 (1954). Petitioners seek to excuse their failure to timely file their 1977 return because: (1) Charles was in poor health at the time the returns were to be filed; (2) Charles did not remember receiving any notice from respondent with respect to the second extension request extending petitioners' due date for the 1977 return to July 15, 1978; (3) respondent acted unreasonably in extending to July 15, 1978 the due date for petitioners' 1977 return when petitioners' second request for extension was received by respondent on July 6, 1978; and (4) respondent was unreasonable in refusing to grant petitioners a second two month extension for their 1977 return when respondent allowed a second extension with respect to their 1978 return. Petitioners have not established reasonable cause for their failure to timely file their 1977 Federal *516 income tax return. They have failed to establish Charles' poor health, and why Ruby and/or petitioners' accountant was unable to timely file their 1977 return. Charles' failure to remember receipt of respondent's notice granting an extension to July 15, 1978 is not persuasive evidence that the notice was not sent and is contradicted by respondent's administrative file, a portion of which is part of the record. Respondent's decision whether to grant a second extension for petitioners' 1977 return was discretionary and the fact that he granted it only to July 15 does not prove that he was unreasonable in doing so. It was up to petitioners to make sure that their return was filed within the time prescribed in the second extension. Petitioners' second request for extension was filed after expiration of the first extended due date, June 15, 1978. Petitioners do not explain their failure to request a second extension before June 15, 1978. Negligence Addition
Petitioners claim they should be relieved from the negligence addition provided in section 6653(a) because they "relied on the advice and ability of an accountant for the preparation of their tax returns." Petitioners have *517 put on no evidence, including even their own testimony, as to how their accountant incorrectly advised or prepared their returns. We find that petitioners have failed to establish reasonable reliance on their accountant or that such reliance relieves them from the obligation to accurately report their income. Decision will be entered under Rule 155.
Footnotes
1. Petitioners conceded prior to trial or on brief all other adjustments made by respondent in his notice of deficiency except those mentioned herein. ↩
2. It is not clear when Hudson paid the $ 40,000 to petitioners. The amount paid to petitioners may have been as much as $ 50,000. ↩
3. The $ 40,000 option price previously paid by Hudson was credited towards the $ 50,000 downpayment. The record is unclear whether petitioners ever received the remaining $ 10,000 of the $ 50,000 cash downpayment. ↩
4. The "goods" referred to in the security agreement were listed as "Exhibit A" attached thereto, but no such exhibit is part of the record. ↩
5. The cancellation letter is not a matter of record, and we know very little of its contents. Charles testified that the letter "cancelled the deal completely." ↩
6. Property equity was not listed in purchase contract II, but represents a finding of the Court using the formula, equity = sales price (-) liens. ↩
7. The tractor was not used in the excavation or reclamation of petitioners' property. ↩
8. The record does not indicate when petitioners filed the second extension request. The second extension request is not a document of record. ↩
9. Respondent does not concede the last two requirements of section 1031, but neither does he argue that petitioners failed to meet those requirements. ↩
10. Charles testified that petitioners were unable to find a copy of the letter either in their own files or those of Mr. Hudson. No mention is made whether petitioners attempted to contact Mr. Cortland's estate in an effort to locate a copy of the alleged rescission letter. ↩
11. Even a simple letter of understanding signed by petitioners and Hudson reflecting their intent to treat the two transactions as an interdependent exchange might have strengthened petitioners' case. ↩
12. Sine the $ 50,000 was cash, it would be taxable as "boot" even if the transaction qualified as an exchange. ↩
13. Unfortunately both parties failed to offer evidence that should have been available to support many of their contentions. Instead their arguments were often based on facts they assumed to be proven. ↩
14. In all likelihood petitioners might have obtained the result they claim, both transaction-wise and tax-wise, had they bargained for it at the time, but there is no direct evidence that an exchange was even considered or discussed. ↩
15. Whether the transfer of the Sky Harbor Complex was intended as an exchange or a sale does impact on Hudson's desire to obtain the highest possible price for the property. ↩
16. Petitioners contend alternatively that the transfer should be treated as a loss "incurred in a trade or business" as provided in section 165(a); as a loss "incurred in a transaction entered into for profit" as provided in section 165(c); or as an ordinary and necessary expense incurred for the production of income as provided in section 212. The three alternative arguments are raised for the first time in petitioners' brief without much, if any, discussion. The record does not support applicability of any of the above quoted provisions. ↩
17. We need not, and do not, address whether the transfer constituted a gift to James or a capital contribution to Thunder Mountain. ↩
18. On brief, petitioners do not press for deductibility of depreciation on the tractor. They state "Petitioners should be allowed depreciation on these items except perhaps the tractor * * * ." ↩
19. Among the factors to be considered are: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activity; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation. ↩